2019 UT App 74

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
CHRISTOPHER MONTES,
Appellant.

Opinion
No. 20170286-CA
Filed May 2, 2019

Seventh District Court, Moab Department
The Honorable Lyle R. Anderson
No. 161700140

Happy J. Morgan, Attorney for Appellant

Sean D. Reyes and Christopher D. Ballard, Attorneys
for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES JILL M. POHLMAN and RYAN M. HARRIS concurred.

MORTENSEN, Judge:

¶1　Christopher Montes had already been held in contempt of court three times when he asked his appointed counsel, "[D]o I need to head-butt you so that the judge will give me a new lawyer?" Based on this statement and other actions of Montes, the trial court ruled that Montes had impliedly waived or forfeited his right to counsel and would be required to represent himself. Montes soon repented, and his lawyer represented him for the rest of the trial, but not before opening statements and two significant witnesses had testified. Now convicted, Montes appeals. Because we conclude that the trial court erroneously determined that the right to counsel had been waived or forfeited, and because we conclude that the error constituted structural error, we must reverse Montes's criminal convictions,

except for those associated with contempt, and remand for a new trial. We affirm, however, Montes's contempt convictions.

## BACKGROUND[1]

### *Theft of the Bikes*

¶2 On a busy morning in October 2016, employees of a bike shop in Moab were outfitting customers who had rented mountain bikes. One employee (Clerk) saw a man—later identified as Montes—removing a bike from an outside display rack and jamming it haphazardly onto a bike rack on the back of a car. Alarmed because the bikes on the display rack were secured with a cable that only an employee could unlock, Clerk ran out the front door of the shop to investigate. By the time Clerk reached the car, Montes was putting a second bike on the car rack.[2] Another employee (Mechanic) positioned himself in front of the car, placed his hands on the hood, and yelled for Montes to stop. Meanwhile, Clerk successfully removed the bikes from the car and then reached inside the car in an attempt to prevent Montes from driving away. Montes ignored the commands to stop and began to pull away. Clerk ran alongside the car as he continued to struggle with Montes through the open driver's door, but he soon jumped free. Mechanic, to avoid being run over, ran up the car's hood, onto the roof, and then jumped off. After the unsuccessful attempt to detain Montes, the employees returned to the bike shop.

¶3 A Utah Highway Patrol trooper (Trooper), after hearing a radio broadcast from the Grand County Sheriff's Office requesting help in locating Montes's car, pulled Montes over,

---

1. "On appeal from a criminal conviction, we recite the facts from the record in the light most favorable to the jury's verdict." *State v. Pham*, 2015 UT App 233, ¶ 2, 359 P.3d 1284.

2. Together, the two bikes had a retail value of over $12,000.

who was leaving town at a speed of eighty-seven miles per hour. Trooper noticed that Montes dropped a small pill bottle on the car floor as Montes was retrieving his identification. The pill bottle contained marijuana, and Trooper placed Montes under arrest for possession of a controlled substance. A subsequent search of Montes's car also yielded a pipe similar to the kind used to ingest illegal drugs, a mirror with a white residue on it, a glass vial with a small spoon attached to it, and bolt cutters. A Moab City police deputy (Deputy) transported Montes back to the bike shop, where employees identified him as the individual who had stolen the bikes.

*Procedural History*

¶4     The State charged Montes with theft, aggravated assault, unlawful use or possession of a controlled substance, possession of paraphernalia, and speeding. After finding Montes indigent, the court appointed counsel (Appointed Counsel) to represent him.

a.     Montes's Complaints at Pretrial Conference

¶5     At a pretrial conference two days before trial, Montes asked the court to appoint new counsel and continue the trial. In addition to contending that his communication with Appointed Counsel was of a limited and argumentative nature, Montes voiced several specific complaints. First, believing that his trial should have taken place within thirty days of arraignment, Montes stated that Appointed Counsel failed to assert his Sixth Amendment right to a speedy trial. The trial court responded that there was no speedy trial issue because the trial was set to occur within three months of arraignment. Second, Montes complained that Appointed Counsel talked him into waiving his preliminary hearing. But Montes was unable to articulate how he was harmed other than he would "like to have [a preliminary hearing]," and the court rejected the claim. Third, Montes explained that Appointed Counsel did not file paperwork to request that Montes be released from jail to visit a sick family member. The trial court told him that was not part of a public

defender's representation. Fourth, Montes complained that Appointed Counsel would not test the bolt cutters and would not ensure that the two bikes, cable, and bolt cutters were admitted into evidence.[3] The court noted that Appointed Counsel had tested the bolt cutters and that pictures of the bikes would be presented as evidence. Finally, Montes revealed that he had filed a complaint in federal district court against Appointed Counsel, apparently because Appointed Counsel had refused to follow his specific directives.

¶6 In rejecting Montes's reasons for releasing Appointed Counsel, the trial court observed that the timing of Montes's complaints suggested that "Montes [was] trying to . . . postpone his trial and create confusion in the system rather than actually improving his chances of prevailing at trial." The court further told Montes:

> You have the right to be consulted, and you have the right to decide important critical questions that take place during the course of the trial, but you do not have the right to make every decision for the . . . defense attorney. That is not something you have the right to do. It would be impossible to have a trial where we had the public defender—or any defender for that matter—as puppet and the accused as puppeteer. That simply will not work. And courts have consistently held that is not the

---

3. The cable that secured the bikes to the shop's display rack had been cut. However, the bolt cutters found in Montes's car were not tested on that cable. At trial, Appointed Counsel asked an investigating officer to cut a cable similar to the one used on the sale rack at the shop. It took forty-seven cuts to sever the demonstration cable, and the attempt left the ends frayed. In contrast, the cable at the bike shop was left with cleaner cuts. However, the officer testified that it had taken fewer cuts to sever the same cable in a test conducted with Appointed Counsel before trial.

> obligation of the defender. The defender is entitled
> to use the defender's judgment in representing the
> accused.

Montes nevertheless asked for a continuance to seek new counsel. The trial court denied the continuance but stated it would release Appointed Counsel if Montes obtained new counsel by the time of trial. But the court warned Montes that if he did not find new counsel, he would have to proceed with trial as scheduled with Appointed Counsel or represent himself. When Montes responded that he would need a continuance if he represented himself, the court told him, "That will not be [an] option," observing that Montes would not have the luxury of saying he wants to represent himself and then insisting on a delay.

b.      Events on the Day of Trial

¶7     It appears that Montes took the court's admonition about delaying the trial to heart, but in the opposite way as it was intended. As Montes left the jail on the morning of the trial, one of the deputies wished him good luck. Montes responded that he did not need good luck because he was going to fire Appointed Counsel and "spend more of Grand County's money."

¶8     Montes appeared at trial without new counsel and insisted that he "[a]bsolutely" refused to proceed with Appointed Counsel. The judge asked Montes, "So do you want me to excuse [Appointed Counsel]?" Montes responded, "If you like." The judge answered, "No, I don't like. I want [Appointed Counsel] to represent you, and . . . you would be a fool not to have him as your representative." After Montes reiterated that he did not want Appointed Counsel to represent him, the court conducted a colloquy to confirm that Montes understood the risk of pro se representation. The court told him that he had only two options—represent himself or accept Appointed Counsel's representation. Montes said he wanted neither, and the court stated that Appointed Counsel would represent Montes. Montes

continued to protest, saying that it would create a conflict of interest since he had filed a complaint against Appointed Counsel.

¶9 Montes then proceeded to rehash his already rejected complaints against Appointed Counsel. The court admonished Montes to stop arguing and interrupting, reiterating that Montes's only two options were to have Appointed Counsel represent him or to represent himself. The judge warned Montes, "If you do not choose one of those [options], I will choose for you. I'm going to give you to the count of ten to decide one of those two options. If you don't decide one of those two options by the time I've counted to ten, [Appointed Counsel] will represent you." The court commenced counting, and at the count of seven, Montes told the court that he did not want Appointed Counsel to represent him but that he did not want to represent himself. The court followed through on its warning and directed Appointed Counsel to represent Montes.

¶10 Yet Montes persisted. He continued to interrupt the court, even after seven warnings to remain silent. The court held him in contempt and sentenced him to thirty days in jail. The court issued another warning that if Montes continued to speak without invitation or permission, it would sentence him to another thirty days in jail. It further explained that Montes would serve that time even if he was acquitted. Montes immediately interrupted, and the court again held him in contempt, sentenced him to another thirty days, and told him he must ask for permission to speak. Montes asked for permission to speak, and the court told him he may on the condition that he give a "different answer to [the] question" of whether he wanted Appointed Counsel to represent him or to represent himself. Montes revisited the already decided complaints against Appointed Counsel. The court responded by saying, "We've talked about that long enough. . . . We will not speak about that," and directed that the prospective jurors be brought into the courtroom for jury selection. Montes interrupted yet again, saying he did not wish to proceed with Appointed Counsel, and the court held him in contempt a third time and imposed

another thirty-day sentence. Undaunted, Montes continued to speak and interrupt the court until prospective jurors were escorted into the courtroom.

¶11    During a short recess after the jury was selected, but outside the jury's presence, Appointed Counsel informed the court that Montes decided to represent himself and was asking for a continuance to prepare. The court denied the continuance and told Montes his "options are to proceed now representing [himself] or to proceed now with [Appointed Counsel]." Appointed Counsel then revealed that Montes had just threatened to harm him by stating:

> [D]o I need to head-butt you so the judge will give me a new lawyer? I'm willing to do that. That's what happens in California when you need a new lawyer, is you harm the attorney, and I'm willing to do that. Let's do that now. There are all these officers around me to witness that happening.

Montes admitted saying "something in that fashion, but not like that." Montes explained that his putative threat was not to be taken literally as it was borne out of frustration:

> I said that . . . I didn't want him to represent me. What did I need to do? Did I need to threaten him or head-butt him or something like that? . . . He's saying that I told him that I'm going to do that, and I did not say that. All I said is that I didn't want him representing me . . . . What is it that one has to go through so that I cannot have [Appointed Counsel] as my counsel? . . . I did not threaten to do it. I asked him, what is it that I have to do? . . . I apologize. I feel strongly, Your Honor, that he's not helping me.

¶12    A lengthy discussion ensued about the appropriate response to the head-butt threat. The court sought assurance that there was "no chance" that Montes would attempt to hurt

Appointed Counsel, but Montes asked for more time to find a different attorney and proceeded to rehash Appointed Counsel's perceived deficiencies. The prosecutor argued that Montes "indicat[ed] that he wants to represent himself by making a physical threat to [his] attorney," but he also suggested that Montes might merely be "posturing" in making the threat. The court raised the possibility of restraining Montes. Montes said that there was no need for restraints and that he was "not adequately fit" to represent himself. He then continued to complain about Appointed Counsel's representation, but the court again determined his complaints were without merit.

¶13 The court returned to the question of whether Montes had "elected to represent himself by his conduct of threatening his lawyer." The prosecutor revealed that Montes had commented to deputies that morning that he intended to delay the trial, an accusation Montes denied. After some discussion, the court ruled that Montes, by his threat to head-butt Appointed Counsel, had elected to represent himself. But the court ordered Appointed Counsel to remain in the courtroom to act as standby counsel.[4] The court gave Montes one more chance to decide if he wanted to proceed representing himself or with Appointed Counsel representing him. Montes answered, "I don't know . . . . I can't answer that." The court responded, "Okay. Then you're going to represent yourself." The jury then entered the courtroom, and the trial proceeded.

¶14 Montes represented himself during opening statements, the full examination of the State's first witness—a Moab police officer (Officer) who had investigated the theft—and the direct examination of Trooper. After the prosecution's opening statements, during which Montes did not object, Montes delivered his own opening statement. As he began his opening statement, Montes asked if he could have Appointed Counsel "sit right here," presumably at the defendant's table. The court

---

4. The court instructed Appointed Counsel to sit "two seats back," presumably behind Montes.

denied the request, and the prosecutor responded that "[t]here is no threat there," presumably meaning that Montes posed no threat if Appointed Counsel remained where he was seated. During his opening statement, Montes struggled, like many pro se litigants, and was admonished by the court several times for testifying and offering arguments instead of summarizing the evidence.

¶15    Early in the direct examination of Officer, Montes attempted to object but stated, "I wouldn't know when and where it would be right to object, so I apologize for what happened earlier, and I would love [Appointed Counsel] to represent me." The court responded, "Okay. We'll talk about that later." Officer then testified about investigating the theft, taking the statements of the employees, and the details of the theft, including the severed cable and the description of the stolen bikes and Montes's car. Officer also testified that bolt cutters were found in Montes's car. Officer further revealed that during transport to the county jail, Montes made some voluntary statements to the effect that he was going to purchase the bikes but had been assaulted by shop employees, that he did not cut the cable, that he wished to go back to the shop to apologize, that he had money to buy the bikes, and that the bolt cutters did not work. On cross-examination conducted by Montes, Officer stated that he had not tested the bolt cutters on the shop's cable. Montes also questioned Officer about the prices of the bikes. Montes conferred with Appointed Counsel once during the cross-examination.

¶16    The prosecution then conducted the direct examination of the second witness—Trooper—who testified to the events surrounding Montes's apprehension. *See supra* ¶ 3. Once direct examination of Trooper concluded, the court took a recess, excused the jury, and took-up Montes's request to reinstate Appointed Counsel.[5] After discussing the issue with the

---

5. Fifty-six pages of trial transcript pass between the time Montes requested that Appointed Counsel be reinstated and the time

(continued…)

prosecutor and Appointed Counsel and receiving Montes's assurance that he would behave, the court allowed Appointed Counsel to resume representation of Montes. Appointed Counsel then cross-examined Trooper and represented Montes for the remainder of the trial.[6]

¶17    At the conclusion of the trial, the jury convicted Montes of theft, aggravated assault, possession of a controlled substance, and speeding. The court sentenced him to an immediate ninety-day jail term for the contempt charges. But the court released Montes from custody on the underlying case while it awaited a pre-sentence investigation report (PSI), so that his contempt sentences would not be credited as time served against his felony and misdemeanor convictions. At sentencing, Appointed Counsel requested that the court follow the PSI matrix and that Montes be given credit for time served. The court did not grant that request, and instead it sentenced Montes to concurrent prison terms of one to fifteen years for theft, zero to five years for aggravated assault, and six months for possession of a controlled substance. The court suspended forty-three days of Montes's contempt sentences and credited him with 113 days of time served.[7] Montes appeals.

---

(…continued)
that the court addressed his request. This delay occurred despite the trial judge having earlier told Montes, "When you . . . say to me, I would prefer to have [Appointed Counsel] here than represent myself, I would hear that."

6. The other witnesses who testified after Appointed Counsel resumed representing Montes were three bike shop employees, the bike shop owner, and three other police officers.

7. Montes had been in jail for 160 days at the time of sentencing. He served forty-seven days on the contempt sentences, leaving a credit of 113 days toward the theft, assault, and possession convictions.

## ISSUES AND STANDARDS OF REVIEW

¶18 The first issue is whether the trial court erred when it (1) ruled that Montes had forfeited or impliedly waived his right to counsel after threatening to head-butt Appointed Counsel and (2) required Montes to represent himself during the first portion of his trial. "Whether [a defendant] voluntarily, knowingly, and intelligently waived his right to counsel is a mixed question of law and fact. While we review questions of law for correctness, a trial court's factual findings may be reversed on appeal only if they are clearly erroneous." *State v. Santonio*, 2011 UT App 385, ¶ 9, 265 P.3d 822 (cleaned up).

¶19 The second issue is whether the trial court erred in imposing three separate sentences for Montes's three contemptuous acts rather than viewing Montes's actions as constituting a single violation. "On review of both criminal and civil [contempt] proceedings, we accept the trial court's findings of fact unless they are clearly erroneous." *Von Hake v. Thomas*, 759 P.2d 1162, 1172 (Utah 1988), *superseded by statute on other grounds as stated in State v. Hurst*, 821 P.2d 467 (Utah Ct. App. 1991).

## ANALYSIS

### I. The Trial Court Erred in Requiring Montes to Represent Himself

A. Montes Did Not Forfeit or Waive His Right to Counsel

¶20 The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI; *see also* Utah Const. art. I, § 12 (stating that the accused has the right to counsel in criminal prosecutions). A defendant may intentionally waive his constitutional right to legal counsel and represent himself, *see State v. Cooper*, 2011 UT App 234, ¶ 13, 261 P.3d 653, but such intentional waiver must be "voluntary,

knowing, and intelligent," *State v. Pedockie*, 2006 UT 28, ¶ 26, 137 P.3d 716. "True waiver typically occurs when a defendant affirmatively requests permission to proceed pro se." *Id.* ¶ 28. With intentional waiver, "[a] defendant should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing." *Id.* ¶ 26 (cleaned up).

¶21   In addition to intentionally waiving the right to counsel, a defendant may lose the right by "forfeiture" and "waiver by conduct." *Id.* ¶ 27. Forfeiture occurs when a defendant "engages in extremely dilatory conduct or abusive behavior, such as physically assaulting counsel." *Id.* ¶ 32 (cleaned up). When a defendant's behavior is egregious enough to constitute forfeiture, the court need not determine whether a defendant understands the risks of pro se representation or even warn a defendant that his behavior could lead to the loss of counsel. *Id.* "But because of its drastic nature, a defendant must engage in extreme conduct before forfeiture may be imposed." *Id.*

¶22   Waiver by conduct, also called implied waiver, "combines elements of both true waiver and forfeiture. Once a defendant has been warned that he will lose his attorney if he engages in dilatory tactics, any misconduct *thereafter* may be treated as an implied request to proceed pro se and thus, as a waiver of the right to counsel." *Id.* ¶ 33 (emphasis added) (cleaned up). Thus, the conduct need not be "as extreme as that required for forfeiture" and "a defendant need not intend to relinquish the right to counsel." *Id.* Nevertheless, a "defendant must have been warned that continuation of the unacceptable conduct will result in a waiver of the right to counsel." *Id.* Unlike forfeiture, waiver by conduct "must be knowing and intelligent" in that a defendant must have been aware of "the dangers and disadvantages of self-representation" at the time of the waiver. *Id.*

¶23   Asserting that none of the three methods of waiver applies in this matter, Montes argues that the trial court erred when it concluded that he had either forfeited or waived by

conduct his right to counsel and required him to represent himself during the first portion of the trial. We agree with Montes that the trial court erred in reaching this conclusion.

¶24   First, Montes never intentionally waived his right to counsel. Just the opposite is true. Montes repeatedly told the court that he did not want to represent himself and that he lacked the skills to do so.

¶25   Second, Montes's threat to head-butt his attorney was not sufficiently egregious to rise to the level of forfeiture. The record indicates that the threat was borne of frustration, desperation, and posturing, with little probability of follow-through. When confronted by the court about the threat, Montes immediately apologized and denied that he intended to harm Appointed Counsel. At most, Montes's threat was a rhetorical device meant to convey the message that he did not want Appointed Counsel to represent him—"What is it that one has to go through so that I cannot have [Appointed Counsel] as my counsel?"[8] Indeed,

---

8. The State relies on *State v. Allgier* (*Allgier I*), 2015 UT 6, 353 P.3d 50 (per curiam), to support its contention that Montes forfeited his right to counsel. But *Allgier I* is readily distinguishable in several ways. First, Allgier's threats were of a more serious and threatening nature, especially considering that Allgier pled guilty to aggravated murder of a police officer while in custody, aggravated escape, aggravated robbery, and disarming a police officer. *Id.* ¶¶ 2–3, 5, 7, 11 n.3; *State v. Allgier* (*Allgier II*), 2017 UT 84, ¶¶ 2–5, 416 P.3d 546. Second, Allgier's threats were made not against trial counsel but against appellate counsel after filing the opening brief. *Allgier I*, 2015 UT 6, ¶ 12. Third, Allgier's threats were directed at three different appointed attorneys. *Id.* ¶¶ 3–7. Fourth, the attorneys Allgier threatened were frightened enough to file motions to withdraw. *Id.* ¶¶ 3, 7. Furthermore, our supreme court cautioned that forfeiture is a "drastic measure" applicable in only the most egregious of cases:

(continued…)

Appointed Counsel remained in the courtroom at the court's direction as standby counsel, and Montes was not physically restrained while he represented himself—facts suggesting that neither the court nor Appointed Counsel regarded the threatened head-butt as serious.

¶26    Third, the trial court erred in concluding that Montes waived his right to counsel by conduct. For the trial court to have reached this conclusion, it was required to warn Montes that "continuation of the unacceptable conduct will result in a waiver of the right to counsel." *Pedockie*, 2006 UT 28, ¶ 33. Montes was repeatedly warned to stop speaking and to choose whether to represent himself or accept Appointed Counsel's representation. If he did not choose one of those two options (i.e., self-representation or representation by Appointed Counsel), the court told Montes that Appointed Counsel would represent him. Thus, the consequence of not choosing was not *losing* Appointed Counsel but *proceeding* with Appointed Counsel. Montes was never warned that he would lose Appointed Counsel's representation if he did not choose. Rather, the only warning Montes received is that he would be required to proceed with Appointed Counsel if he did not make the choice. And an ultimatum to either (1) represent himself or accept Appointed Counsel or (2) be required to proceed with Appointed Counsel is not the equivalent of a warning that

---

(…continued)

> We conclude that making threats to the welfare of appointed counsel may constitute extreme conduct justifying a forfeiture of counsel. Whether a particular course of threatening behavior merits forfeiture will vary according to the particular case. And even when conduct legitimately could be viewed as a forfeiture, courts may err on the side of solicitude to the right to counsel and permit a substitution of counsel.

*Id*. ¶ 10.

"continuation of unacceptable conduct," *see id.*, would result in loss of the right to counsel.

¶27 Therefore, we conclude that because Montes's actions were not sufficiently egregious to justify forfeiture, and because he was not adequately warned that his behavior would result in loss of counsel, the trial court erred in requiring Montes to represent himself.[9]

B. The Denial of Counsel Constituted Structural Error

¶28 "[T]here are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error." *Chapman v. California*, 386 U.S. 18, 23 (1967). These errors are known as "structural errors." *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1907 (2017). Under the structural error standard recently set forth by the United States Supreme Court, *see id.* at 1907–08, a denial of the right to counsel at a critical stage of the criminal process, such as Montes experienced in this case, constitutes structural error and entitles a defendant to a new trial.[10]

---

9. Inexplicably, when Montes attempted to reassert his right to counsel, the trial court delayed addressing that request for some time—as illustrated by the passage of fifty-six pages of transcript. *See supra* note 5. Because we reverse and remand for structural error, we need not address any error associated with this discrete issue.

10. We note that many years prior to *Weaver v. Massachusetts*, 137 S. Ct. 1899 (2017), the United States Supreme Court stated in dicta that the denial of the right to counsel could be analyzed under a harmless error standard: "[T]he right to be represented by counsel, . . . as with most constitutional rights, [is] subject to harmless error analysis unless the deprivation, by its very nature, cannot be harmless." *Rushen v. Spain*, 464 U.S. 114, 117 n.2 (1983) (cleaned up); *see also People v. El*, 126 Cal. Rptr. 2d 88, 90 (Cal. Ct. App. 2002) ("[I]t is well-established that anything

(continued…)

¶29    As a preliminary matter, structural error is distinct from harmless error. Harmless error is defined as an error in the trial process that does not affect "the framework within which the trial proceeds." *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991). "[A] constitutional error does not automatically require reversal of a conviction," for that error might be harmless. *Id.* at 306. The harmless error doctrine requires the prosecution to show "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman*, 386 U.S. at 24. If such a showing cannot be made, a constitutional error cannot be regarded as harmless. Thus, a court may not apply a harmless error analysis if the error complained of "possibly influenced the jury adversely." *Id*. at 23.

¶30    In contrast, the structural error doctrine ensures that "certain basic, constitutional guarantees . . . define the framework of any criminal trial." *Weaver*, 137 S. Ct. at 1907. Structural errors constitute "a limited class of fundamental constitutional errors that defy analysis by harmless error standards." *Neder v. United States*, 527 U.S. 1, 7 (1999) (cleaned up). Thus, the United States Supreme Court has declared that structural errors are "so intrinsically harmful as to require automatic reversal . . . without regard to their effect on the outcome." *Id.* Although the contours of structural error doctrine are prone to a certain nebulous imprecision, in *Weaver* the Supreme Court identified "three broad rationales" for deeming an error structural. 137 S. Ct. at 1908.

---

(…continued)

less than the complete denial of the right to counsel is subject to harmless error analysis."). Yet, even under this earlier standard, the deprivation was not subject to harmless error analysis if it was impossible for the deprivation, "by its very nature," to be harmless. As we explain, *infra* ¶¶ 36–38, deprivation of counsel at a critical stage of the criminal process "cannot be harmless," and thus it lies outside harmless error analysis even under this earlier jurisprudence.

¶31   First, an error is structural "if the right at issue is not designed to protect the defendant from erroneous conviction but instead protects some other interest." *Id.* It does not matter if the exercise of the right in question will increase the likelihood of conviction; what matters is the inviolable nature of the right itself. For example, exercising the right of self-representation "usually increases the likelihood of a trial outcome unfavorable to the defendant." *McKaskle v. Wiggins,* 465 U.S. 168, 177 n.8 (1984). But because the right of self-representation "is based on the fundamental legal principle that a defendant must be allowed to make his own choices about the proper way to protect his own liberty," a denial of that right constitutes structural error. *Weaver,* 137 S. Ct. at 1908. Furthermore, the harm proceeding from self-representation is "irrelevant to the basis underlying the right," so "the Court has deemed a violation of that right structural error." *Id.* And a "criminal defendant's Sixth Amendment right to the Assistance of Counsel" is also of such "fundamental character" that the Court considers its "wrongful deprivation . . . a structural error that so affects the framework within which the trial proceeds that courts may not even ask whether the error harmed the defendant." *Luis v. United States*, 136 S. Ct. 1083, 1088–89 (2016) (cleaned up).

¶32   "Second, an error has been deemed structural if the effects of the error are simply too hard to measure . . . [or] cannot be ascertained." *Weaver*, 137 S. Ct. at 1908 (cleaned up). The effect of an error is immeasurable if (1) it is impossible to show the error is harmless or (2) the cost of showing it is harmless is unjustified. *Id*.

¶33   Third, an error is "deemed structural if the error always results in fundamental unfairness." *Id*. For example, denying an indigent defendant an attorney or failing to give a reasonable-doubt instruction are always fundamentally unfair. *Id*. However, "[a]n error can count as structural even if the error does not lead to fundamental unfairness in every case." *Id*. Thus, fundamental unfairness is an indicator, but not a necessary component, of structural error.

¶34    The Supreme Court has explained, in terms especially relevant to the case now before us, the necessity of counsel:

> The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel. Even the intelligent and educated layman has small and sometimes no skill in the science of law. If charged with crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel [a defendant] may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. . . . [A defendant] requires the guiding hand of counsel at every step in the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence.

*Powell v. Alabama*, 287 U.S. 45, 68–69 (1932). And the right to counsel extends to those who cannot afford to hire an attorney of their own:

> [T]here are few defendants charged with crime, few indeed, who fail to hire the best lawyers they can get to prepare and present their defenses. . . . [L]awyers in criminal courts are necessities, not luxuries. The right of one charged with crime to counsel may not be deemed fundamental and essential to fair trials in some countries, but it is in ours. . . . [The] noble ideal [of a fair trial] cannot be realized if the poor man charged with crime has to face his accusers without a lawyer to assist him.

*Gideon v. Wainwright*, 372 U.S. 335, 344 (1963).

¶35   And more recently, the Supreme Court has described the necessity of counsel as a "fundamental" right "by which an innocent man can make the truth of his innocence visible." *Luis*, 136 S. Ct. at 1089 (cleaned up). So fundamental is the right that it requires that "the Government provide counsel for an indigent defendant accused of all but the least serious crimes." *Id.* (cleaned up). The Court "consider[s] the wrongful deprivation of the right to counsel a structural error that so affects the framework within which the trial proceeds that courts may not even ask whether the error harmed the defendant." *Id.* (cleaned up).

¶36   But the denial of the right to counsel, standing alone, does not necessarily constitute structural error. To find structural error, the deprivation must occur at a critical stage of criminal proceedings:

> Under both the United States Constitution and the Utah Constitution, [a defendant has] the right to the assistance of counsel at all critical stages of his criminal proceeding. The accused's right to the assistance of counsel during the critical stages of a criminal proceeding has long been recognized as a fundamental constitutional right. . . . In most cases, if the reviewing court holds that a constitutional error was harmless beyond a reasonable doubt, it need not reverse. However, we may find constitutional error without any showing of prejudice when counsel was either totally absent, or prevented from assisting the accused during a *critical stage* of the proceeding.

*State v. Curry*, 2006 UT App 390, ¶¶ 6–8, 147 P.3d 483 (emphasis added) (cleaned up); *see also United States v. Cronic*, 466 U.S. 648, 659 n.25 (1984) ("The [Supreme] Court has uniformly found constitutional error without any showing of prejudice when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding."). Relevant

to the present case, opening statements and the examination and cross-examination of witnesses are critical stages of the criminal process.

¶37 Courts widely regard opening statements as constituting a critical stage of criminal proceedings. "The purpose of an opening statement is to apprise the jury how the case will develop, its background and what will be attempted to be proved; but it is not evidence." *Commonwealth v. Parker*, 919 A.2d 943, 950 (Pa. 2007) (cleaned up). "[A]s a practical matter the opening statement can often times be the most critical stage of the trial, because here the jury forms its first and often lasting impression of the case." *Id.* (cleaned up); *see also Crim v. State*, 294 N.E.2d 822, 830 (Ind. Ct. App. 1973) (stating that opening statements are "critical stages" of a trial); *State v. Johnson*, 391 P.3d 711, 717 (Kan. Ct. App. 2017) (stating that the opening statements and examination of the prosecutor's key witness are "critical stages of the trial"), *review granted* (Sept. 29, 2017); *Commonwealth v. Ramos*, 849 N.E.2d 243, 247 (Mass. App. Ct. 2006) ("It is well understood among litigators that an opening statement can be critical in preventing a jury from forming a one-sided view at the trial's outset.").

¶38 The examination and cross-examination of witnesses also constitutes a critical stage of the criminal process. The United States Supreme Court has stated that a preliminary hearing is a "critical stage" in the criminal process precisely because it involves the examination and cross-examination of witnesses: "[T]he lawyer's skilled examination and cross-examination of witnesses [during a preliminary hearing] may expose fatal weaknesses in the State's case . . . . [T]he skilled interrogation of witnesses by an experienced lawyer can fashion a vital impeachment tool for use in cross-examination of the State's witnesses at the trial . . . ." *Coleman v. Alabama*, 399 U.S. 1, 9 (1970); *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 239 (1973) (The "right of cross-examination . . . is an essential safeguard to [a defendant's] right to confront the witnesses against him."). The inability of an accused to realize

the advantages of effective examination and cross-examination absent a lawyer's assistance makes a preliminary hearing "a critical stage of the State's criminal process at which the accused is as much entitled to such aid of counsel as at the trial itself." *Coleman*, 399 U.S. at 10 (cleaned up). Part of a lawyer's value is assisting the accused by making informed and experienced judgment calls about when and to what extent, if at all, to engage in examination and cross-examination of witnesses. Thus, where courts have recognized the critical nature of examination and cross-examination of witnesses at preliminary proceedings, it follows, a fortiori, that the examination of witnesses marks a critical stage of the trial itself.

¶39 The United States Supreme Court has further clarified that "[d]espite its name, the term 'structural error' carries with it no talismanic significance as a doctrinal matter." *Weaver*, 137 S. Ct. at 1910. Its availability does not require defense counsel to invoke the term "structural error" as an incantation. Rather, "in the case of a structural error where there is an objection at trial and the issue is raised on direct appeal, the defendant generally is entitled to automatic reversal regardless of the error's actual effect on the outcome." *Id.* (cleaned up).

¶40 We note that Montes invokes the incorrect standard of harmless error with regard to the denial of his right to counsel, but, under the circumstances of his case, this denial is subject to structural error analysis. As the United States Supreme Court made clear in *Weaver*, a structural error analysis is prompted by (1) an objection regarding the error made at trial and (2) the issue being raised on appeal. *Id.* So, while Montes on appeal fails to mention structural error by name, it remains clear that he objected to being required to represent himself at trial. Equally clear is that Montes raises this same issue on appeal. Therefore, the trial court's deprivation of Montes's right to counsel is subject to structural error analysis on appeal.

¶41 The record confirms Montes was limited to self-representation during a significant portion of the trial—the opening statements, Officer's entire testimony, and Trooper's

direct testimony. Although we cannot quantify from the cold record the exact number of minutes Montes represented himself, the record transcript indicates that he did so for 91 out of 246 pages, or 37 percent of the trial. As we have pointed out, *supra* ¶¶ 37–38, the opening statements and examination of witnesses mark a critical stage of the criminal process. A deprivation of counsel during a critical stage of a trial—and for more than one-third of the trial—constitutes structural error because it "pervade[s] the entire proceeding," *Satterwhite v. Texas*, 486 U.S. 249, 256 (1988), and determines "the framework within which the trial proceeds," *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991).

¶42 Appointed Counsel may have pursued a different approach to opening statements, trial strategies, questioning of witnesses, and style of argument. Montes may have changed the way he acted at trial in the presence of counsel. He may have been more cooperative or appeared more sympathetic to the jury with counsel sitting beside him. It is simply impossible to know how different choices made by Appointed Counsel would have impacted the outcome of the proceedings. Thus, because a deprivation of counsel during a critical stage of the trial constitutes structural error, and because structural errors are considered "intrinsically harmful . . . without regard to their effect on the outcome," Montes is entitled to "automatic reversal." *Neder v. United States*, 527 U.S. 1, 7 (1999).[11]

---

11. We note that the trial court could have avoided structural error by insisting that Montes proceed with counsel until (1) he expressly stated his desire to represent himself or (2) he continued to engage in dilatory behavior after being warned that such misconduct would result in loss of counsel via implied waiver.

## II. Montes Failed to Preserve a Challenge to the Separate Contempt Sentences

¶43    Montes argues that the trial court erred in sentencing him to three separate sentences for the contempt citations. We do not consider this issue because we have determined that Montes failed to preserve it and has identified no exception to the preservation requirement. "As a general rule, claims not raised before the [trial] court may not be raised on appeal." *Oseguera v. State*, 2014 UT 31, ¶ 10, 332 P.3d 963 (cleaned up). "An issue is preserved for appeal when it has been presented to the [trial] court in such a way that the court has an opportunity to rule on it." *Id.* (cleaned up).

¶44    The record offers no instance of Montes or his counsel[12] objecting or otherwise making any of the arguments he now asserts on appeal regarding his contempt convictions and sentences.[13] Nor does Montes argue that an exception to the preservation rules applies.[14] Thus, we decline to consider this

---

12. Montes was represented by Appointed Counsel when he incurred the contempt citations and when he was sentenced on them.

13. In his reply brief, Montes argues that the issue was preserved when at sentencing Appointed Counsel asked the court to "follow the matrix, impose the supervised probation, and give [Montes] credit for the jail that he's served." We conclude that such an oblique request did not give the sentencing court the opportunity to rule on the imposition of separate sentences for the contempt charges.

14. Montes devoted two sentences to ineffective assistance of counsel as an exception to preservation in the prefatory section of his brief. Oddly, he does not develop the point any further in the remainder of his brief. Our supreme court has long held that appellate courts "have discretion to not address an inadequately

(continued…)

unpreserved issue, and we affirm the convictions and sentences on contempt.

CONCLUSION

¶45    We conclude that the trial court erroneously determined that Montes had forfeited or impliedly waived his right to counsel, thus depriving him of counsel during critical stages of trial and committing structural error. We reverse and remand for a new trial on all convictions except for those associated with contempt. We decline to address Montes's challenges to his separate contempt sentences because he failed to preserve this issue. Accordingly, the contempt convictions and sentences stand.

¶46    Affirmed in part. Reversed in part and remanded.

_____

(…continued)
briefed argument. Rather, a party must plead his claims with sufficient specificity for this court to make a ruling on the merits. We will not assume a party's burden of argument and research." *Angel Inv'rs, LLC v. Garrity*, 2009 UT 40, ¶ 35, 216 P.3d 944 (cleaned up). Thus, we consider the matter inadequately briefed and decline to address it.