2023 UT App 33

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
BRYN MICHAEL PATTON,
Appellant.

Opinion
No. 20210681-CA
Filed April 6, 2023

Fifth District Court, St. George Department
The Honorable G. Michael Westfall
No. 201502281

Nicolas David Turner, Attorney for Appellant

Eric Clarke and Jerry D. Jaeger,
Attorneys for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and RYAN M. HARRIS
concurred.

MORTENSEN, Judge:

¶1 Bryn Michael Patton was charged with theft and possession of a controlled substance after he allegedly picked up his son's medication from a pharmacy despite not being authorized to do so. When Patton declined the appointment of counsel, the district court indicated that Patton had waived his right to counsel. However, the cursory waiver discussion the court had with Patton was insufficient to determine whether Patton's waiver was made knowingly and intelligently. And no other evidence indicates that Patton understood the nature of his waiver. Therefore, we conclude that Patton did not knowingly and intelligently waive his right to counsel. We vacate his

conviction and sentence, and we remand the matter to the district court for a new trial.

## BACKGROUND

¶2 In September 2020, Patton allegedly went to a pharmacy and picked up his son's prescription for Adderall.[1] The next day, Patton's ex-wife discovered this action and contacted the police because Patton was not allowed to pick up the prescription, as he did not have custody of his son and had experienced previous issues with prescription medications. Patton allegedly did not return the medication and was later charged with class A misdemeanor possession or use of a controlled substance and class B misdemeanor theft.

¶3 In February 2021, Patton appeared before the district court. The minutes of the hearing indicate that Patton "was [a]dvised of charges and penalties" and his "right to counsel" but that he "waive[d] [his] right to counsel" and chose "to self-represent." The transcript of the hearing provides the following exchange:

> The Court: You're also entitled to be represented by an attorney, and you can hire your own, or if you couldn't afford one, I could appoint one. Are you going to hire an attorney, Mr. Patton?
>
> Patton: No, sir.
>
> The Court: Do you want me to see if you qualify to have one appointed?

---

1. Adderall is "[a] combination of drugs used as a treatment for attention deficit hyperactivity disorder (ADHD) and narcolepsy (a sleep disorder). It is a type of stimulant." *Adderall*, National Cancer Institute, https://www.cancer.gov/publications/dictionaries/cancer-terms/def/adderall [https://perma.cc/55DJ-T4GG].

Patton: No, this is a garbage case. I'm not worried about it.

The Court: You want to represent yourself?

Patton: Yes, sir.

The Court: All right. Well, I'm—I'm a little offended that I'm dealing with a garbage case, but that—that does not—does not say a whole lot about you favorably that you would speak of it in that regard, but whatever. The—you are facing a Class A—

Patton: Well, if I'm—

The Court: —and Class B Misdemeanor. For a Class A Misdemeanor, the maximum penalty in the State of Utah is a year in jail and a $2500 fine, plus a 90 percent surcharge and $53 court security fee. For a B Misdemeanor, the maximum penalty is six months in jail and $1,000 fine, plus that 90 percent surcharge and the $53 court security fee.

I anticipate that—well, the county attorney's office is staffed with attorneys who are familiar with the Rules of Criminal Procedure and the Rules of Evidence. So I anticipate that if you represent yourself, you'll probably be operating at a bit of a disadvantage, but if you still want to do that and represent yourself, you can. Do you still want to represent yourself?

Patton: Yes, sir.

The Court: All right.

The court set a date for a half-day bench trial, which was to be held via videoconference. Patton did not file any motions or engage in discovery before that date.

¶4 On the day of the bench trial, Patton was not on the video call when the trial began. The district court found that Patton had been notified and voluntarily failed to appear, and it proceeded with the trial. The court heard testimony from Patton's ex-wife and son and from the officer who had interviewed Patton's ex-wife after she contacted the police to report Patton picking up the Adderall. The court was in the process of issuing its ruling—it stated that it found Patton guilty of the possession charge but was "a little more concerned about the theft issue because . . . [Patton] paid for it"—when Patton joined the video call. Patton explained that he "was having an issue with [his] phone" and that, in addition to his tardiness, he was also "on audio only."

¶5 The court responded that it had "just finished the trial" and "was in the process of issuing [its] ruling." The court said it would tell Patton "what the evidence that's been presented demonstrate[d]," indicating that Patton's ex-wife's and son's testimonies showed that Patton picked up the prescription, "that the prescription was not intended for [Patton], [that] it was never delivered to [his son], [and] that [Patton] kept it." The court stated that the officer's testimony "[p]rimarily . . . was that the prescription of Adderall is a Schedule II controlled substance, which would make possession of somebody else's Adderall a Class A Misdemeanor."

¶6 The district court asked Patton if he wanted to cross-examine the witnesses, and Patton responded that he did not and admitted to picking up the prescription. He tried to explain the situation by stating that he and his son both had prescriptions for Adderall and sometimes shared their pills. The court rebuffed this effort and, when Patton tried to provide the same explanation later, said, "[Y]ou might not want to go a lot farther with that, Mr. Patton, because if you've been giving somebody else your Adderall, that is a felony distribution of a controlled substance." Patton told the court, "I—I guess I'm—I guess—I—I really feel at a loss here because I came in late. . . . To be honest, I thought—I

thought this was—this court case was another court case. I did not know it was this one, so I'm very ill[-]equipped. I thought . . . I thought this whole case was in May." The court then briefly summarized the evidence again and asked, "With that in mind, do you want to cross examine—do you want to reconsider your decision and cross examine anybody, or do you want to just have me make a decision based on the evidence that I have?" Patton responded, "Your Honor, go ahead and make a decision based on the evidence you have." The court found Patton guilty on the possession charge and indicated that it was still struggling with the theft charge, at which point Patton said, "Your Honor, in all honesty, if I can say one thing, I'm a victim of what's called chemo fog[2] because I had cancer, and I don't remember a lot of things. So I'm really, really at a disadvantage now." The court went on to finish issuing its ruling, dismissing the theft charge.

¶7 The court then asked Patton if he wanted to come back for sentencing another day, to which Patton responded, "No, your Honor, I'd like to just take care of [it] today, if possible." The court said, "All right. So I'm aware of [the State's] recommendations." The State had recommended supervised private probation and a fine of $750, with half of that creditable for substance abuse evaluation and treatment. The court then asked Patton, "[W]hat do you think I ought to do in terms of sentencing?" Patton responded, "You know, it would only be right for me to say for you to follow the law and to serve justice as it properly needs to be served [in] this matter for the actions that were committed."

---

2. "Chemo brain is a common term used by cancer survivors to describe thinking and memory problems that can occur during and after cancer treatment. Chemo brain can also be called chemo fog, cancer-related cognitive impairment or cognitive dysfunction." *Chemo brain*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/chemo-brain/symptoms-causes/syc-20351060 [https://perma.cc/HBJ6-HUX7].

The court then sentenced Patton on the possession charge to "the maximum, which is 364 days in jail and a $2500 fine, plus a 90 percent surcharge and a $53 court security" fee, but it stayed the jail time and placed Patton on private supervision for twenty-four months. The court also suspended a portion of the fine, reducing it to $750 plus the security fee.

¶8 Later, Patton submitted a letter indicating that he wished to appeal the ruling because he "suffer[ed] greatly from a condition commonly referred to as Chemo Brain which is a post cancer medical issue that is caused by [a] significant amount of chemotherapy and radiation." Patton indicated that he was "seeking an opportunity to reappear and retry [his] case with the assistance of counsel" because "[w]ith the anxiety and forgetfulness associated with" his condition, he was "unable to make decisions and speak on a matter like when [he was] tried for this case." Patton then stated,

> I am asking the court to please grant me this appeal and let me seek counsel as I am not capable of doing this properly where I get an actual fair chance in court. I collect SSI/Disability purely from the Chemo Brain[,] and if I cannot hold a job properly then I clearly should not be trying to represent myself which has proven to be exactly that. I am asking for help and prefer a physical in person trial process or at least be with someone who can help speak on my behalf.

¶9 Patton sent another letter some three months later declaring, "To this date, I have not heard anything regarding this appeal which is why I am writing this follow up." In this letter, he claimed, "[A]fter I filed the appeal, the medication that I was accused of stealing was found at the home of the person who originally filed the police report. I DID NOT steal them as I was accused of." Patton attributed the circumstances to his medical

condition: "My memory and my Chemo Brain was why I could not find the misplaced medication and was accused of taking or stealing it[,] but I didn't[,] and they found the prescription I was originally accused of taking which I did not do." That same day, the court scheduled a hearing to determine Patton's indigency status on appeal. At that hearing, the court called Patton's earlier letter a "Notice of Appeal . . . that has gone unaddressed" and declared that it was "treating this as a timely filed Notice of Appeal." The court also found Patton indigent and appointed counsel to represent Patton in this appeal.

## ISSUE AND STANDARD OF REVIEW

¶10    On appeal, Patton argues that the waiver of his right to counsel was not knowingly and intelligently made. "Because the determination that a defendant has [knowingly and] intelligently waived his right to counsel turns upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused, the constitutionality of an accused's waiver of the right to counsel is a mixed question involving both fact and law." *State v. McDonald*, 922 P.2d 776, 780 (Utah Ct. App. 1996) (cleaned up).[3] Thus, we review the district

---

3. For some time, various judges on this court have been using the parenthetical "(cleaned up)" to enhance the readability of our opinions. *See State v. Cady*, 2018 UT App 8, ¶ 9 n.2, 414 P.3d 974, *cert. denied*, 421 P.3d 439 (Utah 2018). Our opinions also employ the parenthetical "(quotation simplified)," which is identical in meaning to "(cleaned up)." *See In re K.W.*, 2018 UT App 44, ¶ 15 n.3, 420 P.3d 82. Both parentheticals indicate the omission of internal quotation marks, brackets, ellipses, emphases, internal citations, and footnote signals in published sources, as well as the traditional parenthetical notation referencing a prior case or cases being quoted. Ellipses indicate all other omissions. We also use

(continued…)

court's determination "for correctness, but with a reasonable measure of discretion given to the trial court's application of the facts to the law." *State v. Petty*, 2001 UT App 396, ¶ 4, 38 P.3d 998 (cleaned up), *cert. denied*, 42 P.3d 951 (Utah 2002).

ANALYSIS

## I. The Waiver Colloquy

¶11 Patton asserts that the district court erred in failing to conduct an adequate "self-representation colloquy to determine that [his] desire to represent himself was knowingly and intelligently made." We agree.

¶12 Both the Utah Constitution and the Sixth Amendment to the United States Constitution provide persons accused of

---

these parentheticals to make unbracketed changes to capitalization. Apart from capitalization, alterations to words in the source are indicated by brackets.

These parentheticals are powerful editing tools because they make legal writing less tedious, more streamlined, and more concise. But their appeal begets a temptation to misuse them. And we acknowledge that we have, at times, ventured too far by using them with (1) quotations from unpublished sources not readily available to the public (namely, briefs, lower court documents, and transcripts) and (2) quotations of parenthetical language from cases citing other cases. To be more transparent and precise, we intend to limit our employment of these parentheticals to the circumstances identified in the above paragraph, and we expect practitioners who choose to employ these devices to abide by these same strictures. So that consistency of use might be achieved, the publishers of *The Bluebook* may wish to adopt rules similar to those proffered by Jack Metzler. *See* Jack Metzler, *Cleaning Up Quotations*, 18 J. App. Prac. & Process 143, 154–55 (2017).

criminal charges with the right to be represented by counsel in their defense. Utah Const. art. I, § 12; U.S. Const. amend. VI. This right also implicitly carries with it the right of self-representation. *Faretta v. California*, 422 U.S. 806, 817 (1975); *State v. Hassan*, 2004 UT 99, ¶ 21, 108 P.3d 695. "It follows therefrom that an accused's decision to [self-represent] is a waiver of the right to assistance of counsel." *State v. Frampton*, 737 P.2d 183, 187 (Utah 1987). Accordingly, "it is the trial court's duty to determine if this waiver is a voluntary one which is knowingly and intelligently made." *Id.*; *see State v. Petty*, 2001 UT App 396, ¶ 5, 38 P.3d 998, *cert. denied*, 42 P.3d 951 (Utah 2002); *State v. McDonald*, 922 P.2d 776, 779 (Utah Ct. App. 1996).

¶13 In *State v. Frampton*, 737 P.2d 183 (Utah 1987), a defendant faced charges related to selling counterfeit baseball gloves. *Id.* at 186. The defendant's first trial, in which the defendant was represented by counsel, resulted in a hung jury. *Id.* The defendant then represented himself during his second trial, but that trial resulted in a mistrial after the judge recused himself partway through the proceedings. *Id.* At the third trial, the defendant declared that he would represent himself, and the judge also appointed a public defender as standby counsel. *Id.* The defendant was convicted, and he argued on appeal that "his conviction should be overturned because he failed to knowingly and intelligently waive his right to counsel." *Id.* at 187. Our supreme court stated that "[s]ince [the] defendant expressly declined an offer of counsel by the trial judge, he has the burden of showing by a preponderance of the evidence that he did not so waive this right." *Id.* But the court made clear that defendants electing to represent themselves "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish" that they know what they are doing and their "choice is made with eyes open." *Id.* (cleaned up) (quoting *Faretta*, 422 U.S. at 835). The court indicated that "[g]enerally, this information can only be elicited after penetrating questioning by the trial court. Therefore, a colloquy on the record between the

court and the accused is the preferred method of ascertaining the validity of a waiver because it [e]nsures that defendants understand the risks of self-representation." *Id.*

¶14 In expressing its clear preference for a colloquy, the *Frampton* court "pointed trial courts to a scripted colloquy from the Bench Book for United States District Court Judges, outlining questions which might be asked to verify that a defendant understands the significant right being waived and how that waiver might be applied in the real-world setting of a trial court." *State v. Rohwedder*, 2018 UT App 182, ¶ 22, 436 P.3d 324 (Mortensen, J., concurring), *cert. denied*, 437 P.3d 1248 (Utah 2019). The colloquy is as follows:

> (a) Have you ever studied law?
>
> (b) Have you ever represented yourself or any other defendant in a criminal action?
>
> (c) You realize, do you not, that you are charged with these crimes: (Here state the crimes with which the defendant is charged.)[?]
>
> (d) You realize, do you not, that if you are found guilty of the crime charged in Count I, the court . . . could sentence you to as much as _____ years in prison and fine you as much as $_____? (Then ask . . . a similar question with respect to each other crime with which [the defendant] may be charged in the indictment or information.)
>
> (e) You realize, do you not, that if you are found guilty of more than one of those crimes this court can order that the sentences be served consecutively, that is, one after another?
>
> (f) You realize, do you not, that if you represent yourself, you are on your own? I cannot tell you

how you should try your case or even advise you as to how to try your case.

(g) Are you familiar with the . . . Rules of Evidence?

(h) You realize, do you not, that the . . . Rules of Evidence govern what evidence may or may not be introduced at trial and, in representing yourself, you must abide by those rules?

(i) Are you familiar with the . . . Rules of Criminal Procedure?

(j) You realize, do you not, that those rules govern the way in which a criminal action is tried in . . . court?

(k) You realize, do you not, that if you decide to take the witness stand, you must present your testimony by asking questions of yourself? You cannot just take the stand and tell your story. You must proceed question by question through your testimony.

(l) (Then say to the defendant something to this effect): I must advise you that in my opinion you would be far better defended by a trained lawyer than you can be by yourself. I think it is unwise of you to try to represent yourself. You are not familiar with the law. You are not familiar with court procedure. You are not familiar with the Rules of Evidence. I would strongly urge you not to try to represent yourself.

(m) Now, in light of the penalty that you might suffer if you are found guilty and in light of all the difficulties of representing yourself, is it still your desire to represent yourself and to give up your right to be represented by a lawyer?

(n) Is your decision entirely voluntary on your part?

(o) If the answers to the two preceding questions are in the affirmative, you should then say something to the following effect: "I find that the defendant has knowingly and voluntarily waived [the] right to counsel. I will therefore permit [the defendant] to [self-represent]."

(p) You should consider the appointment of standby counsel to assist the defendant and to replace [the defendant] if the court should determine during trial that the defendant can no longer be permitted to [self-represent].

*Frampton*, 737 P.2d at 187 n.12 (quoting *Bench Book for U.S. District Court Judges*, vol. 1 §§ 1.02-2 to -5 (Federal Judicial Center, 3d ed. 1986)).[4] While a waiver colloquy need not follow this precise script, "the sixteen-point colloquy found in *State v. Frampton* establishes a sound framework for efficient and complete questioning. Moreover, on appeal, such a colloquy provides the reviewing court with an objective basis for review upon the almost inevitable challenge to the waiver by the defendant who proceeds pro se and is subsequently convicted." *State v. Pedockie*, 2006 UT 28, ¶ 42, 137 P.3d 716 (cleaned up).[5]

---

4. Later editions of the Benchbook have made some alterations to the colloquy, *see, e.g.*, *Benchbook for U.S. District Court Judges* § 1.02 (Federal Judicial Center, 6th ed. 2013). Here we provide the language quoted in *State v. Frampton*, 737 P.2d 183 (Utah 1987), but subsequent versions are also effective.

5. Our supreme court has "urged" and "strongly recommend[ed]" trial courts to employ the full *Frampton* colloquy. *State v. Pedockie*, 2006 UT 28, ¶¶ 40, 42, 137 P.3d 716. Recent cases highlight that this urging has not been universally embraced. We encourage trial courts to keep a prepared *Frampton*

(continued…)

¶15    The district court here did not perform an adequate *Frampton* colloquy. After Patton indicated that he did not want an attorney appointed, the district court did not engage in the usual series of questions designed to determine whether Patton fully understood the risks of proceeding pro se. Instead, the court chided Patton for calling the proceeding "a garbage case" and then identified the charges and the maximum penalties for each. This sufficiently addressed the *Frampton* colloquy topic of the seriousness of the charges and the associated possible maximum penalties. However, the colloquy provided in *Frampton* includes the desirable next step of confirming the defendant's understanding of this information, *see Frampton*, 737 P.2d at 187 n.12, which step the court ignored.

¶16    And the court either entirely omitted or fell well short of addressing other key points of the *Frampton* colloquy. The court did not question Patton to determine whether he had any legal knowledge, criminal defense experience representing himself or anyone else, understanding of consecutive sentencing were he to be convicted of both charges, awareness that he would not receive assistance in his defense from the court, familiarity with the Utah Rules of Evidence and the Utah Rules of Criminal Procedure or basic knowledge of their roles in court proceedings, or understanding of the nature of his role as both interviewer and testifier were he to testify. *See id.* In fact, the court engaged in no questioning that could be considered "penetrating," *see id.* at 187, to determine Patton's level of understanding about the risks he was accepting and the benefits he was forfeiting.

¶17    Furthermore, while the court indicated that "the county attorney's office is staffed with attorneys who are familiar with the Rules of Criminal Procedure and the Rules of Evidence," its warning on the associated disadvantages of self-representation

---

waiver-of-counsel colloquy script at the ready on the bench, for use when the occasion arises.

was extraordinarily shallow: "So I anticipate that if you represent yourself, you'll probably be operating at a bit of a disadvantage, but if you still want to do that and represent yourself, you can." This fell far short of providing the warning the *Frampton* court recommended. *See id.* at 187 n.12 ("I must advise you that in my opinion you would be far better defended by a trained lawyer than you can be by yourself. I think it is unwise of you to try to represent yourself. You are not familiar with the law. You are not familiar with court procedure. You are not familiar with the Rules of Evidence. I would strongly urge you not to try to represent yourself."). Moreover, the court's warning actually downplayed the disadvantages Patton would face in proceeding pro se. This is not language that we can condone. Therefore, we are convinced that the district court's perfunctory exchange with Patton was inadequate to satisfy the standard articulated in *Frampton*.

¶18   Our conclusion that the court's limited discussion was insufficient is supported by our application of the *Frampton* standard in other cases. In *State v. Petty*, 2001 UT App 396, 38 P.3d 998, *cert. denied*, 42 P.3d 951 (Utah 2002), for example, a defendant faced charges after attempting to pawn a handgun while restricted from possessing a gun based on a previous conviction. *Id.* ¶¶ 2–3. The defendant was represented by appointed counsel for his initial appearance, preliminary hearing, and arraignment, but then "appointed counsel informed the court that [the defendant] wished to represent himself, that he had represented himself in the past, and that counsel stood ready to act as standby counsel." *Id.* ¶ 3. "The trial court then engaged [the defendant] in a brief colloquy," *id.*, during which "the trial court inquired about [the defendant's] education, his general understanding of the legal system, [and] his knowledge of the Rules of Evidence and Procedure[] and informed him that he had the right to counsel as well as the right to proceed pro se," *id.* ¶ 7. "The trial court also advised [the defendant] against proceeding pro se and selected [the defendant's] appointed counsel to act in a standby capacity." *Id.* The court then granted the defendant's request to proceed pro

se. *Id.* ¶ 3. On appeal, this court concluded that "at no point during the colloquy did the trial court address whether [the defendant] comprehended the nature of the charges and proceedings or the range of permissible punishments." *Id.* ¶ 7 (cleaned up). Accordingly, we held that "in the absence of a complete colloquy, . . . [the defendant] did not knowingly and intelligently waive his right to counsel." *Id.* ¶ 11.

¶19　Here, the district court addressed the nature of the charges and possible punishments, but like in *Petty*, it did not perform a "complete colloquy." *See id.* The district court did not inquire about Patton's education, understanding of the legal system, or knowledge of the Utah procedural or evidentiary rules, unlike the trial court in *Petty*. *See id.* ¶ 7. The court here also did less to advise Patton against proceeding pro se than the trial court did in *Petty*. *See id.* And the court did not appoint standby counsel, as the court did in *Petty*, *see id.*, and as our supreme court has recommended, *see State v. Bakalov*, 862 P.2d 1354, 1355 (Utah 1993) (per curiam) ("The court is also urged to appoint standby counsel to preserve [the defendant's] right to self-representation and to preclude subsequent claims of lack of waiver or ineffective assistance of counsel."). Moreover, in *Petty* the defendant's counsel had represented the defendant for some proceedings (giving the defendant some awareness of the benefits of having counsel), and counsel also indicated that the defendant had represented himself in the past, 2001 UT App 396, ¶ 3, neither of which is true here. Accordingly, we have no trouble concluding that the district court's exchange with Patton was less comprehensive than the one in *Petty* and that it was likewise inadequate to show that the waiver was knowingly and intelligently made.

¶20　Similarly, this court found a colloquy to be insufficient in *State v. Smith*, 2018 UT App 28, 414 P.3d 1092, where a defendant faced five charges and was unrepresented at a hearing after conflicts arose with each of four previously appointed attorneys, *id.* ¶¶ 4–7. We concluded that the colloquy was insufficient partly

because the defendant "refused to engage with the court and responsively answer the court's questions": "For most of the colloquy, [the defendant] was silent . . . . And when [the defendant] did respond, his answers were largely nonresponsive to the questions posed. For example, when the court asked [the defendant] to talk about his legal knowledge, he responded that it 'doesn't matter' . . . ." *Id.* ¶¶ 9, 24. We indicated that "if there are any doubts regarding the defendant's understanding of the consequences of waiver, those doubts must be resolved in favor of the defendant." *Id.* ¶ 16 (cleaned up). Furthermore, we concluded that we could not "discern from the court's interaction with [the defendant] whether he understood the risks he undertook in choosing to represent himself at sentencing" as there was "no evidence that [the defendant] was informed of the risks associated with representing himself for sentencing purposes" and "[t]he court did not ask questions aimed specifically toward determining [the defendant's] understanding of what it would mean to waive counsel for sentencing." *Id.* ¶ 25. We also found "no evidence from which we could conclude that [the defendant] understood the various matters germane to a sentencing proceeding, such as whether certain evidence militated against imposing the maximum available penalty for the convictions." *Id.* ¶ 26. Ultimately, we concluded that the defendant's waiver was not "knowingly and intelligently made." *Id.* ¶ 27.

¶21 We note similar circumstances here. While Patton responded to the court's limited questions, his response to the court's question about whether he wanted counsel appointed was, "No, this is a garbage case. I'm not worried about it." This is similar to the *Smith* defendant's response that "it doesn't matter." *See id.* ¶ 24 (cleaned up). The court appeared to take offense from Patton's statement, but it did not ask any follow-up questions to determine, for example, whether this statement meant that Patton was hopeless about succeeding in the case or that he felt there was no basis for the case and expected to be acquitted. Additionally,

Patton—like the defendant in *Smith*—was not represented at sentencing, and the court took no steps to inform him of the risks associated with waiving the right to counsel for sentencing or to gauge his understanding of the risks of proceeding pro se for sentencing. *See id.* ¶¶ 25–26. Patton's comment that "it would only be right for me to say for you to follow the law and to serve justice as it properly needs to be served [in] this matter for the actions that were committed" clearly demonstrates that Patton did not understand his role as his own advocate at sentencing and, like the defendant in *Smith,* that he did not understand "the various matters germane to a sentencing proceeding, such as whether certain evidence militated against imposing the maximum available penalty for the convictions." *See id.* ¶ 26. For these reasons, we reach the same conclusion as this court did in *Petty* and *Smith* and determine that the court did not perform an adequate colloquy to establish that Patton's waiver was knowingly and intelligently made.

## II. Other Record Evidence of Waiver

¶22   Rather than defend the district court's cursory discussion with Patton as a sufficient colloquy, the State argues that Patton made a knowing and intelligent waiver of his right to counsel apart from any colloquy. Our supreme court has indicated that "reviewing courts will rarely find a valid waiver of the right to counsel absent a colloquy." *State v. Pedockie*, 2006 UT 28, ¶ 45, 137 P.3d 716. But despite advocating a clear and complete colloquy, the *Frampton* court indicated that "[e]ven absent such a colloquy," we "look at any evidence in the record which shows a defendant's actual awareness of the risks of proceeding pro se." *State v. Frampton*, 737 P.2d 183, 188 (Utah 1987). And our supreme court in *Frampton* was "careful to note that the validity of a waiver would turn not on whether the trial judge actually conducted the colloquy, but rather 'upon the particular facts and circumstances surrounding each case.'" *State v. Hassan*, 2004 UT 99, ¶ 22, 108 P.3d 695 (quoting *Frampton*, 737 P.2d at 188). Thus, it is

appropriate for a reviewing court to "look at any evidence in the record which shows a defendant's actual awareness of the risks of proceeding pro se," *Frampton*, 737 P.2d at 188, whether the trial court conducted a proper colloquy or not. To find that a waiver was made knowingly and intelligently, our review must reveal that "the defendant understood the seriousness of the charges and knew the possible maximum penalty," as well as "that the defendant was aware of the existence of technical rules and that presenting a defense is not just a matter of telling one's story." *Id.* (cleaned up). And "considering the strong presumption against waiver and the fundamental nature of the right to counsel, any doubts must be resolved in favor of the defendant." *Pedockie*, 2006 UT 28, ¶ 45.[6]

¶23 There have been at least two notable instances of "rare" waivers that have been determined valid absent a colloquy. *See State v. Bozarth*, 2021 UT App 117, ¶ 45, 501 P.3d 116. First, the *Frampton* court held that the defendant failed to meet his burden of showing that his waiver was not made knowingly and intelligently because—on the facts of his particular case—the record clearly demonstrated that he understood the risks of proceeding pro se, including understanding the seriousness of the charges and being aware of the technical rules of procedure. 737 P.2d at 189. The court highlighted the fact that the defendant

---

6. This statement from our supreme court appears to be in tension with, and maybe antithetical to, that court's prior holding that defendants bear the burden of showing that they did not waive their right to counsel. *See State v. Frampton*, 737 P.2d 183, 187 (Utah 1987). We previously noted this tension in *State v. Bozarth*, 2021 UT App 117, ¶ 41 n.1, 501 P.3d 116. A better, and far clearer, rule would be that where a trial court fails to employ a *Frampton* colloquy, the presumption is that waiver did not occur and the burden would be placed on the State to prove otherwise. We hope that our supreme court would look favorably on such an articulation.

had been represented by counsel in his first trial—which made him aware of the advantages of representation and exposed him to the technical aspects of procedure and evidence, as well as the facts that the defendant filed eighteen motions on his own behalf and spoke to the jury about the charges, to support its conclusion that the defendant's waiver was made knowingly and intelligently. *Id.*

¶24    Similarly, in *State v. Bozarth*, 2021 UT App 117, 501 P.3d 116, this court found that the defendant had knowingly and intelligently waived his right to counsel, despite the trial court not conducting a proper *Frampton* colloquy, because the record clearly demonstrated the defendant's understanding of his waiver. *Id.* ¶ 42. Initially, the trial court had appointed counsel, but before trial, the defendant expressed a clear desire to represent himself, with only the "assistance of counsel." *Id.* ¶ 9 (cleaned up). Appointed counsel expressed to the court that he found the defendant "to be more educated in the law than other people," saying, "He's cognizant of what his rights are. . . . He knows the law to some degree. He's very well versed to some degree." *Id.* (cleaned up). The court then honored the defendant's request to represent himself, allowing him to proceed pro se, and it "appointed standby counsel 'on a limited basis to assist' [him]." *Id.* ¶ 10. The court also ensured that the defendant had access to legal materials and explained some court procedures, including the process for filing. *Id.* ¶¶ 10, 13. The defendant subsequently filed multiple motions, *id.* ¶¶ 13, 15, and when these were denied, *id.* ¶¶ 16–17, he negotiated a plea agreement, *id.* ¶ 18. On appeal, the defendant argued that he did not knowingly and intelligently waive his right to counsel. *Id.* ¶ 21.

¶25    On these facts, we noted that "it is possible—although perhaps rare—for a defendant to knowingly and intelligently waive the right to counsel without a *Frampton* colloquy," *id.* ¶ 41 (cleaned up), and we ultimately concluded that "the record demonstrate[d] that [the defendant] understood the value of

counsel and was well aware of the risks of proceeding pro se," *id.* ¶ 42. To reach this conclusion, we "conduct[ed] a de novo review of the record to analyze the particular facts and circumstances surrounding the case," *id.* ¶ 41 (cleaned up), looking for "'any evidence in the record which shows a defendant's actual awareness of the risks of proceeding pro se,'" *id.* (quoting *Frampton*, 737 P.2d at 188). We expressed that "[t]he record [was] replete with evidence indicating that [the defendant] understood his role." *Id.* ¶ 46. For example, once the defendant had "indicated that he wanted to represent himself, the court instructed him on the process for court filings, reminding him that he was responsible for filings since he was representing himself. Thereafter, [the defendant] filed numerous court documents." *Id.* Additionally, at another hearing the court "took the time to explain both [the defendant's] and standby counsel's roles"— including indicating that the defendant "would be required to conduct opening and closing arguments, ask questions of witnesses, and run hearings and the trial because standby counsel would not be taking on that role"—and it "confirmed that this was [the defendant's] understanding." *Id.* ¶ 47. Accordingly, we concluded that the defendant "clearly stated that he understood the implications of the arrangement to which he had agreed." *Id.* Furthermore, at a later hearing, the court again explained procedures, and then the defendant "proceeded to manage the hearing—almost entirely on his own—by asking questions, lodging objections, and complying with the rules of evidence." *Id.* ¶ 48. So we concluded that "[t]he record demonstrate[d] that [the defendant] was informed of his responsibilities as a pro se defendant and standby counsel's limited role, and his behavior indicated that he clearly understood those responsibilities." *Id.*

¶26　The circumstances of this case fall far afield from those in *Frampton* and *Bozarth*, and the record does not support a conclusion that Patton waived his right to counsel knowingly and intelligently. Unlike in *Frampton* and *Bozarth*, the record does not provide any support for the notion that Patton understood the

nature of his waiver, and the State wholly fails to point us to any such evidence. The State argues only that Patton's comment about this being a "garbage case" was flippant and disrespectful to the court. But even assuming that it was, this in no way excuses the court from properly ascertaining whether Patton's waiver of his right to counsel was knowingly and intelligently made. There is nothing in the record that indicates Patton understood the risks of proceeding pro se or the technical rules associated with doing so. This is unlike the defendant in *Bozarth*, who repeatedly verbalized his understanding of the risks associated with proceeding pro se and of his role. *Id.* ¶ 47. This is also unlike both *Frampton* and *Bozarth* in that the defendants in those cases had experience being represented by counsel (and therefore had some insight into benefits they were giving up), while Patton did not. *Frampton*, 737 P.2d at 189; *Bozarth*, 2021 UT App 117, ¶¶ 7–9. The court had no information that Patton had experience representing himself or someone else, and it did not examine Patton's familiarity with the law or the rules of procedure.

¶27 Also unlike the defendants in *Frampton* and *Bozarth*, Patton took no action prior to trial that demonstrates an awareness of the responsibilities of pro se representation. Where the defendant in *Frampton* filed eighteen motions on his own behalf, 737 P.2d at 189, and the defendant in *Bozarth* filed multiple motions and negotiated a plea agreement, 2021 UT App 117, ¶¶ 18, 46, Patton filed no motions and took no other action before trial. Indeed, Patton was not even aware that the video hearing was the trial for these charges—a misunderstanding so basic it must cut against any argument that he understood the procedures of the court. And shortly after Patton joined the hearing, it became clear that he did not understand his role in representing himself. He did not seek to cross-examine any witnesses or provide any evidence, he made no objections, and he repeatedly tried to explain the circumstances of the case with information that could incriminate him on other charges. Clearly, Patton was not aware "that presenting a defense is not just a matter of telling one's story." *See*

*Frampton*, 737 P.2d at 188 (cleaned up). He also never mentioned the Utah Rules of Criminal Procedure or the Utah Rules of Evidence during the trial. This is in sharp contrast to the defendant in *Bozarth*, who "proceeded to manage the hearing—almost entirely on his own—by asking questions, lodging objections, and complying with the rules of evidence." 2021 UT App 117, ¶ 48.

¶28    As discussed above, Patton's comment on sentencing further demonstrates that he did not understand his role as both defendant and advocate. Indeed, he did not advocate for any sentence lower than what the State recommended. The court ultimately ordered the maximum possible fine, though it suspended a portion of it.

¶29    Finally, Patton's statements about his medical condition cut against a conclusion that he understood the nature of his waiver. Patton stated in his post-trial letter, "I collect SSI/Disability purely from the Chemo Brain and if I cannot hold a job properly then I clearly should not be trying to represent myself which has proven to be exactly that." This statement shows that Patton did not comprehend that he was representing himself because he seems surprised that it "has proven to be exactly that." But additionally, our supreme court has declared that a trial court should "carefully evaluate the accused's background, experience, and conduct insofar as they indicate what the accused understands in attempting to waive the right to counsel." *State v. Bakalov*, 1999 UT 45, ¶ 23, 979 P.2d 79. Questions about Patton's background or experience would likely have included questions about his profession, and a response that he was not able to work would almost certainly have elicited the question of why he was unable to work, revealing his medical condition. But the court did not inquire as to Patton's education, and the limited responses it elicited from Patton did not demonstrate his comprehension of the waiver. While the trial court in *Bozarth* had reason to believe that the defendant was

well-educated and "very well versed" in the law for a layperson, 2021 UT App 117, ¶ 9 (cleaned up), the district court here had no reason to believe the same about Patton. If the court had engaged in sufficiently penetrating questioning during its exchange with Patton, it seems very likely that Patton would have stated that he suffers from "chemo fog" or "chemo brain," which information Patton freely revealed without prompting during his trial, when he also stated that his impaired cognitive ability and memory put him "really, really at a disadvantage" in being able to mount a defense to the charges. Ultimately, the court did not attempt to draw out any information on Patton's background or experience that would indicate that Patton understood the nature of his waiver, and the record does not provide evidence that he did.

¶30 For these reasons, we find the State's argument without merit and conclude that the record does not show that Patton waived his right to counsel knowingly and intelligently.

CONCLUSION

¶31 The district court did engage in some discussion with Patton related to his waiver of counsel, but that exchange fell well short of establishing that Patton's waiver was made knowingly and intelligently. And the record does not provide other evidence demonstrating that Patton understood the nature and implications of his waiver. Accordingly, Patton has satisfied his burden of showing that his waiver was not made knowingly and intelligently. We therefore vacate Patton's conviction and sentence on the possession charge, and we remand to the district court for a new trial on that charge.

—————————