2025 UT App 49

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
SCOTT NICHOLAS LUCKE,
Appellant.

Opinion
No. 20230428-CA
Filed April 10, 2025

First District Court, Logan Department
The Honorable Spencer D. Walsh
No. 221100020

Debra M. Nelson, Benjamin Miller, and Dylan
Carlson, Attorneys for Appellant

Derek E. Brown and Ginger Jarvis,
Attorneys for Appellee

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGES GREGORY K. ORME and MICHELE M. CHRISTIANSEN
FORSTER concurred.

TENNEY, Judge:

¶1    Scott Lucke's ex-wife obtained a civil stalking injunction that prohibited him from contacting her. After he later texted her, she reported him to police. Lucke was subsequently charged with stalking. Before trial, Lucke waived his right to counsel, and at the close of trial, the jury convicted him as charged. On appeal, and with the benefit of appellate counsel, Lucke argues that the district court did not ensure that he knowingly and intelligently waived his right to counsel, and he further argues that the record itself contains no indication that his waiver was knowing and voluntary. We agree, and we further agree that this amounted to

structural error. We accordingly vacate Lucke's conviction and remand for further proceedings consistent with this opinion.

BACKGROUND

¶2 Lucke and his ex-wife (Ex-Wife) were married for about three years. They have one child (Child) together. When Child was five years old, Lucke relinquished his parental rights, thereby allowing Ex-Wife's new husband to adopt her.

¶3 In August 2021, Ex-Wife obtained a temporary civil stalking injunction against Lucke. The injunction included a no-contact order that prohibited Lucke from contacting Ex-Wife or Child by "phone, text, mail, [or] email" for a period of three years.[1]

¶4 In November 2021, Lucke texted Ex-Wife. The two engaged in the following text exchange:

> Lucke: On my way home from Salt Lake, figured I would try to call you . . . talk to [Child]
>
> Ex-Wife: Not sure you received it, but we have a 3 year protection order against you. Please don't contact me again in any way or I'll report it.
>
> Lucke: I did, had the opportunity to contest it, but I chose not to contest it for several reasons . . . the biggest being why? Loved how you lied and said I was trying to enter your house and refused to leave . . . hilarious . . . but there is a chance we'll bump into each other in Idaho and then what?

---

1. The injunction also prohibited Lucke from contacting Ex-Wife's new husband or the children that she'd since had with her new husband.

¶5     Ex-Wife reported this contact to law enforcement, and the State later charged Lucke with one count of stalking, a third-degree felony.[2] At his arraignment, Lucke pled not guilty.

¶6     Lucke represented himself during the preliminary hearing. As part of its case, the State called and examined a deputy (Deputy) who had investigated Lucke's case. When Lucke cross-examined Deputy, he asked only two questions for which the court did not sustain an objection. After the State rested, Lucke told the court that he wanted to call Ex-Wife and Child to testify. But when the court asked Lucke if he had subpoenaed them, Lucke said that he had not and that he wasn't aware that he could. The court then directed the parties to present closing arguments. After those concluded, the court asked Lucke, "Do you want to see if you qualify for a court-appointed attorney?" Lucke said that he did not. When the court asked why, Lucke responded, "So they can hold my hand and sign me away?" The court responded by telling Lucke that an attorney could "give [him] legal advice."

¶7     The court moved on to the question of whether the State had presented sufficient evidence to bind Lucke over for trial on the stalking charge. The court concluded that the State had.

¶8     The court then asked Lucke whether he was working and whether he had property or assets, presumably in an attempt to ascertain whether Lucke would qualify for a court-appointed attorney. The court and Lucke then had the following exchange:

---

2. Lucke was charged with violating Utah Code section 76-5-106.5. Under that provision, an actor is guilty of stalking "if the actor intentionally or knowingly" violates "a stalking injunction," Utah Code § 76-5-106.5(2)(b)(i), and the offense becomes a third-degree felony if the actor "has been . . . a cohabitant . . . of the victim," *id.* § 76-5-106.5(3)(b)(v). The stalking statute has been amended since Lucke's trial, but because there were no substantive changes to the elements of the charge, we cite the current version for convenience.

Court: Okay. Why wouldn't you want an attorney who has been to law school, who understands the rules of evidence, the law, who understands your rights under the Constitution—

Lucke: I understand slavery, dude.

Court: Okay.

Lucke: I've been through the system twice.

Court: All right.

Lucke: Okay. I understand it. I understand what you want.

Court: I don't want anything—

Lucke: And I'm not going to be scared into picking left or right, because no decision is my decision.

Court: Okay. What I'm trying to communicate to you, okay, Mr. Lucke, is that the impression I get is that you feel you don't trust the system. You feel very upset about your experience maybe in the past with the courts. Obviously today, I can appreciate that. Some people are frustrated by the system.

     What I'm trying to communicate to you is you haven't been to law school. A public defender has been to law school. He can provide you with legal counsel. He can help you ask questions. He can help you prepare a defense. So I don't know why you wouldn't want the assistance of an attorney, even if maybe your experience in the past hasn't been what you'd hope for. Don't you want the Court to appoint counsel to help represent you?

Lucke: No.

Court: Okay. Do you know what's going to happen potentially at a jury trial if we have a jury here and you start popping off—

Lucke: I'm already dead, dude, I don't care.

Court: Okay.

Lucke: I don't care.

Court: If you start popping off and saying the "F" word and getting really upset and you don't know the rules of evidence. Like today you tried to get into some topics that weren't proper. I think it could really help you to have an attorney sit with you, help guide you. All right.

So do you want me to appoint counsel to represent you?

Lucke: No.

Unidentified female: Yes.

Court: Okay. So is this your mom here? Okay. You ever heard of the term that mother knows best? Yeah.

Lucke: No.

Court: Okay. Pretty good advice. Moms have a lot of experience. They know their kids pretty well.

Lucke: Right.

Court: And I think she thinks it would be in your best interest to appoint counsel. All right. So what we'll do is I want . . . to give you a chance to sit on it and think about it a little bit. Okay.

Lucke: That's the thing, I don't think.

Court: Okay.

Lucke: I don't think anymore.

Court: Well, that's why it would be important to have an attorney to help you.

Lucke: I'm sure it would. I'm sure you think it would.

Court: All right.

Lucke: It won't.

Court: All right.

The court then moved on, set Lucke's case for a pretrial conference, and said that it would "address [his] attorney situation" then.

¶9 The record does not contain a transcript of Lucke's first pretrial conference. During a second pretrial conference, the court and Lucke had another exchange about whether Lucke would be represented by counsel. The court told Lucke that although he had "the right to represent" himself, "it's never a bad idea to have someone who is trained in the law, who understands the rules of evidence and procedure to at the very least consult with, even if you don't want them actively asking the questions in your case." The court then asked Lucke if he had "reconsidered [his] position to want to represent" himself, to which Lucke responded, "No, I haven't quite done that yet."

¶10 At a later pretrial conference, Lucke indicated that he had not hired an attorney and did not plan on hiring one. The court explained to Lucke,

> Now, you've never gone to law school. It still may be a good idea, especially on a third-degree felony where you could be facing the potential of prison, for you to hire your own attorney. But if you're choosing to represent yourself, that's your prerogative. You can do so under the United States Constitution.

Lucke responded by asking the court whether he would be allowed to call Ex-Wife and Child as witnesses. The court said, "I can't give you legal advice. But, yeah, you can subpoena any individuals that you'd like to come testify."

¶11 At his final pretrial conference, Lucke indicated that he had filed subpoenas for both Ex-Wife and Child. The State objected to Lucke's subpoena of Child, arguing that she could not testify to anything "relevant to the[] allegations" because she "wasn't even there, and she wasn't a witness to any of what was going on." During his response to that objection, Lucke made several comments about how the court "entrap[s] people." In response, the court "caution[ed]" Lucke that it's "[n]ever a good idea to personally attack the judge in front of the jury." The court also warned Lucke not to swear in the courtroom, and it then quashed his subpoena for Child.[3]

¶12 The court then addressed Lucke's attorney situation again, and the following exchange occurred:

> Court: Mr. Lucke, I really think you're making a mistake by not having an attorney represent you at your jury trial. Now, I've told you that at every

---

3. During various proceedings, Lucke had used profanity in his remarks to the court.

hearing we've had from the beginning of this case. I told you I'd appoint a public defender, and I'm still willing to do that.

Would you like to be appointed a public defender to help you out with your case?

Lucke: No.

Court: Why not?

Lucke: Because he's not going to represent me. He's going to represent his perception of me. Just like you aren't judging me. You're judging your perception of me.

Court: Okay.

Lucke: I don't think people understand—

Court: I'm not the smartest guy ever, but I don't understand what that means.

Okay. So when I say "appoint an attorney," that means that they know the rules of the evidence. They know the rules of the procedure. They know how to question witnesses really well. And so he could advocate on your behalf. He can meet with you, strategize with you.

Lucke: No.

Court: You sure?

Lucke: No.

Court: All right. So if you're going to represent yourself, I'm going to require that you follow certain

rules of decorum in the courtroom. And you've been pretty good today, not perfect. One, is you can't be dropping the "F" word in the courtroom. We're not going to be doing that. Two, is when I'm speaking or when someone else is speaking, you have to let us speak and you'll be given a turn to speak. So there has to be order in the courtroom. We can't be talking over one another. All right.

¶13 The court then discussed voir dire and jury instructions with Lucke. After Lucke expressed some concern about how the jury pool would be selected, the court said,

Mr. Lucke, I'm not going [to] sit here and argue with you. I'm trying to be very polite to you and, frankly, this gives me a little bit of concern about how our jury trial is going to go.

If there's going to be back and forth arguing with the Court, I've had this happen one other time with a pro se individual, and I showed a lot of patience. But he wouldn't stop talking when he was supposed to and the rules allow me to remove you from the courtroom. If that were to happen, then, you know, I'm going to—it's going to be difficult. Because I think I need to probably appoint standby counsel, a public defender, to not be involved in your case at all unless you get kicked out of your own jury trial. Because I'm going to kick you out if you're not going to follow the rules.

So do you want me to appoint standby counsel or are you going to . . . .

Lucke responded, "You can. You can do whatever you want." The court appointed standby counsel.

¶14    Lucke's case went to trial in March 2023. At the beginning, Lucke indicated that he wanted his standby counsel to help him with jury selection, and when the court asked if Lucke wanted further assistance from standby counsel, Lucke said, "Oh, let's wing it. Let's just see how it unfolds." The court refused to ask several voir dire questions that Lucke personally proposed, and standby counsel did occasionally assist Lucke with some aspects of jury selection. On the State's motion, the court also excluded several of Lucke's proposed exhibits as irrelevant.

¶15    In its opening statement at trial, the State characterized this as "a simple case," explaining that Lucke "was ordered by a court not to violate the stalking injunction and not to contact [Ex-Wife] and he did so." Lucke gave his own opening statement. He said, in the entirety,

> I guess the evidence is just going to show that I wanted to say good-bye. That I love my kid more than a piece of paper. They found the one thing I couldn't not do, and they made it a felony. They used my kid as bait. That's what the evidence is going to show. A trap. Couldn't make it 90 days. Yeah.

When the court then asked Lucke if he had "more to say," Lucke responded, "No. You've taken everything else."

¶16    The State's first witness was Ex-Wife. Ex-Wife testified about her relationship with Lucke, about obtaining the stalking injunction against Lucke in August 2021, and about receiving the text from Lucke in November of that year. When Lucke arose to begin his cross-examination of her, his first words were, "Say happy birthday." The court interjected and told Lucke to "[m]ove on" to his first question. Lucke then asked Ex-Wife several questions, but the State successfully objected to many of them on relevance grounds. Standby counsel stepped in and asked Ex-Wife seven questions. When Lucke then attempted to ask Ex-Wife

a few more questions, the State made successful objections to nearly all of them.

¶17    The State's second witness was Deputy. Deputy testified about interviewing both Ex-Wife and Lucke about the alleged violation of the stalking injunction. On cross-examination, Lucke and standby counsel each asked Deputy a few questions.

¶18    At the outset of its closing argument, the State reiterated its contention that this was a "simple and straightforward" case. The State then reviewed the elements of the offense and explained how the evidence satisfied the elements. When it was time for his closing, Lucke said that he had "nothing," and he also indicated that he did not want standby counsel to give a closing argument on his behalf. He instead referred the jury back to his opening statement. The case was then submitted to the jury. And at the close of deliberations, the jury found Lucke guilty as charged.

¶19    Before sentencing, Adult Probation and Parole prepared a presentence investigation report. There, the investigator opined that Lucke "appear[ed] to be suffering from some sort of mental health issue that would be apparent to most reasonable individuals" and that Lucke "appear[ed] to be in desperate need of a mental health evaluation." At the subsequent sentencing hearing, Lucke made a number of seemingly irrational statements. Among other things, he told the court:

> I was 12,345 days old when I experienced death while meditating. I haven't had a thought since. It's been 1,111 days since that happened. I am 13,456 days old.
>
> I am what I've always been, a divine mirror of God. God doesn't judge anybody, because he is your heartbeat. Yeah, you feel it? You wouldn't know God if he bit you on the ass.

After Lucke concluded his statement, the court told Lucke that it thought he was "struggling with some mental health things." The court imposed a sentence of zero to five years in prison, and it also issued a permanent stalking injunction. Appellate counsel subsequently appeared and filed a notice of appeal.

ISSUE AND STANDARD OF REVIEW

¶20 Through appellate counsel, Lucke argues that the district court erred "when it found [that] Lucke had knowingly and intelligently waived his right to counsel after a truncated colloquy." The question of whether a defendant "voluntarily, knowingly, and intelligently waived his right to counsel is a mixed question of law and fact. While we review questions of law for correctness, a trial court's factual findings may be reversed on appeal only if they are clearly erroneous." *State v. Pedockie*, 2006 UT 28, ¶ 23, 137 P.3d 716 (quotation simplified). "In the absence of a colloquy, we review the record de novo to determine whether the defendant knowingly and intelligently waived [the] right to counsel." *State v. West*, 2023 UT App 61, ¶ 17, 532 P.3d 114.

ANALYSIS

¶21 "The Sixth Amendment to the United States Constitution guarantees a defendant's right to representation throughout his or her criminal trial," which includes "an indigent defendant's right to appointed counsel, as well as the right to waive representation and proceed pro se." *State v. Petty*, 2001 UT App 396, ¶ 5, 38 P.3d 998. But if a defendant waives the right to counsel and elects to proceed pro se, "it is the trial court's duty to determine if this waiver is a voluntary one which is knowingly and intelligently made." *State v. Patton*, 2023 UT App 33, ¶ 12, 528 P.3d 1249 (quotation simplified). Thus, "before permitting a defendant to self-represent, a trial court should ensure that the waiver of counsel is voluntary, knowing, and intelligent." *State v. West*, 2023 UT App 61, ¶ 27, 532 P.3d 114 (quotation simplified).

"In making this determination, the defendant should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open." *State v. Frampton*, 737 P.2d 183, 187 (Utah 1987) (quotation simplified).

¶22 Our cases set out two paths under which a court can find that a defendant's waiver was knowing and intelligent. First, "a colloquy on the record [is] the preferred method of determining whether a defendant is aware of the[] risks" of proceeding pro se. *State v. Pedockie*, 2006 UT 28, ¶ 42, 137 P.3d 716. Second, "[a]bsent a colloquy on the record, a reviewing court should review the record de novo to determine whether the defendant knowingly and intelligently waived his right to counsel." *Id.* ¶ 45.

¶23 On appeal, Lucke argues that there was not an adequate colloquy and that the record likewise does not establish that he knowingly and intelligently waived his right to counsel. He further argues that we should reverse on this basis alone without requiring an additional showing of prejudice. We agree on all fronts.[4]

---

4. As we've previously recognized, there's something of a conflict in our supreme court's cases as to how courts should assess such claims. In *State v. Frampton*, the court said that where a "defendant expressly decline[s] an offer of counsel by the trial judge, he has the burden of showing by a preponderance of the evidence that he did not [knowingly and intelligently] waive this right." 737 P.2d 183, 187 (Utah 1987). But more recently, in *State v. Pedockie*, the court said that "considering the strong presumption against waiver and the fundamental nature of the right to counsel, any doubts must be resolved in favor of the defendant." 2006 UT 28, ¶ 45, 137 P.3d 716. We've recognized this tension before. *See, e.g.*, *State v. West*, 2023 UT App 61, ¶ 29 n.5, 532 P.3d 114; *State v. Patton*, 2023 UT App 33, ¶ 22 n.6, 528 P.3d 1249; *State v. Bozarth*, 2021 UT App 117, ¶ 41 n.1, 501 P.3d 116. In this appeal, we believe that the

(continued…)

A. Knowing and Intelligent Waiver

1. The Colloquy

¶24 "The best way to ascertain if a defendant has the requisite knowledge of the legal mire [he] wishes to wade into is for a court to engage in penetrating questioning on the record." *West*, 2023 UT App 61, ¶ 31 (quotation simplified). In *Frampton*, our supreme court set forth a sixteen-point colloquy that's designed for this very purpose. *See* 737 P.2d at 187 n.12. And the supreme court has since held that this colloquy "establishes a sound framework for efficient and complete questioning." *Pedockie*, 2006 UT 28, ¶ 42; *see also West*, 2023 UT App 61, ¶ 31 ("Such questioning is the encouraged practice for courts, utilizing *Frampton*'s sixteen-point guide as a framework to ensure a defendant is making the decision to proceed pro se knowingly and intelligently." (quotation simplified)).

¶25 We've stated that compliance with the *Frampton* colloquy is "not mandatory," *State v. Bozarth*, 2021 UT App 117, ¶ 41, 501 P.3d 116, and that its questions are "not talismanic," *State v. Waterfield*, 2014 UT App 67, ¶ 20, 322 P.3d 1194. But even so, our supreme court has explained that this colloquy is the "preferred method" of ascertaining whether the defendant is "aware of the dangers and disadvantages of self-representation." *Pedockie*, 2006 UT 28, ¶ 42 (quotation simplified); *accord West*, 2023 UT App 61, ¶ 32 n.6. The reason for this is that, by design, the colloquy provides both the defendant and the court with the necessary

---

outcome would be the same under either rubric. But in light of the apparent conflict in the standards, we'll "again take the liberty to suggest that the better, and far clearer, rule would be that where a trial court fails to employ a *Frampton* colloquy, the presumption is that waiver did not occur and the burden would be placed on the State to prove otherwise." *West*, 2023 UT App 61, ¶ 29 n.5 (quotation simplified).

information to determine that the defendant's waiver of counsel was indeed knowing and intelligent.

¶26 One difficulty arises in situations in which a court asks some, but not all, of the questions. Our appellate cases haven't settled on a magic number of questions that must be asked for a colloquy to be deemed sufficient, but we have expressed some wariness if the district court engaged in only a "partial colloquy." *State v. Lee*, 2024 UT App 2, ¶ 10, 542 P.3d 974. And in several cases, our appellate courts have reversed where a district court had asked some, but not all, of the questions. *See, e.g., id.* (holding that "the colloquy was inadequate" where it "addressed only two of *Frampton*'s recommended questions"); *West*, 2023 UT App 61, ¶¶ 36, 39 (holding that the defendant's waiver of counsel was not knowing and intelligent even though the district court warned her that "she may have put herself at a disadvantage"); *Patton*, 2023 UT App 33, ¶¶ 17, 21 (same).

¶27 The question of "whether a knowing and intelligent waiver has been made turns upon the particular facts and circumstances surrounding each case." *Frampton*, 737 P.2d at 188. And in the case before us here, it's clear enough that the colloquy was indeed a partial one. Of the sixteen items in the *Frampton* colloquy, the district court did address some of them in some form. For example, the court told Lucke, "[Y]ou haven't been to law school. A public defender has been to law school." The court informed Lucke that it couldn't "give [him] legal advice." The court warned Lucke that it thought he was "making a mistake by not having an attorney represent [him]." The court asked Lucke if he wanted standby counsel appointed, and it appointed a public defender to act as standby counsel.[5] These all correspond with items from the *Frampton* colloquy.

---

5. While Lucke did get some assistance from standby counsel, we've previously rejected the argument that the "presence of standby counsel is a significant safeguard that may offset the

(continued…)

¶28    But there were many items from the *Frampton* colloquy that the court did not cover in any form at all. The district court did not ask Lucke if he had ever represented himself or anyone else in a criminal action. It did not warn Lucke of the particular maximum punishment he faced if convicted. It did not advise Lucke that if he chose to testify, he would have to proceed question by question. And of particular significance, in our view, it did not ever ask Lucke if his decision was entirely voluntary. Indeed, the court never actually made a finding on the record that Lucke had knowingly and voluntarily waived his right to counsel—i.e., that he knew "what he [was] doing and his choice [was] made with eyes open." *Id.* at 187 (quotation simplified).

¶29    Moreover, it's not clear that what occurred here was even a meaningful colloquy at all. The term "colloquy" is commonly understood to refer to a "conversation" or a "dialogue."[6] Consistent with this definition, *Frampton* and its progeny contemplate that the district court will engage in a two-way interaction with the defendant. *Frampton* observed that as a district court seeks to comply with its "duty to determine if [the] waiver is a voluntary one which is knowingly and intelligently made," the "information" at issue can "generally . . . only be elicited after penetrating questioning" from the court. *Id.* Consistent with this directive, we note that most (though not all) of the items in the *Frampton* colloquy are explicitly phrased as questions. *See id.* at 187 n.12. And subsequent cases have reiterated this point. *See, e.g., Pedockie*, 2006 UT 28, ¶ 42 (contemplating that the court will engage in "efficient and complete questioning" of the defendant); *West*, 2023 UT App 61, ¶ 36 (noting that the "court simply mentioned" that the defendant "may have put herself at a disadvantage, with no other *discussion* or explanation" (emphasis added)); *Patton*, 2023 UT App 33, ¶ 16

─────────────────────

deficiencies in the colloquy." *State v. Petty*, 2001 UT App 396, ¶ 9 n.4, 38 P.3d 998. So too here.

6.    *Colloquy*,    Merriam-Webster,    https://www.merriam-webster.com/dictionary/colloquy [https://perma.cc/NJ3K-3VSX].

(noting that "the court engaged in no questioning that could be considered penetrating to determine [the defendant's] level of understanding about the risks he was accepting and the benefits he was forfeiting" (quotation simplified)).

¶30    Again, the question before the district court was whether Lucke's waiver of counsel was knowing and intelligent, which required the court to have some sense from Lucke that he understood the right that he was waiving (i.e., the right to the assistance of counsel) and the various risks of proceeding pro se. Here, the court did address some of the items from the *Frampton* colloquy at various pretrial conferences. But in each instance, the court did not engage in a two-way interaction that was characterized by questions and answers. And without receiving answers from Lucke, the court had no meaningful basis for ascertaining whether Lucke actually understood both the right he was waiving and the risks of proceeding along this path.

¶31    In short, given the district court's failure to address many of the items from the *Frampton* colloquy, as well as its failure to ask questions and then receive answers in an effort to gauge Lucke's understanding, the colloquy that did occur does not support the conclusion that Lucke's waiver was knowing and intelligent.[7]

---

7. We recognize the high burden that is placed on the shoulders of our district courts, which must deal with any manner of legal questions on a daily basis. But even so, a defendant's constitutional right to counsel must be protected, and the way that this is done is by ensuring that any waiver of that right is knowing and intelligent.

Our supreme court has accordingly referred to the *Frampton* colloquy as being "the most efficient means by which appeals may be limited." *Frampton*, 737 P.2d at 187. To forestall appeals such as this one, we again "encourage trial courts to keep a prepared *Frampton* waiver-of-counsel colloquy script at the

(continued…)

2.      The Record

¶32    Even without an adequate colloquy, we may still "review the record de novo to determine whether the defendant knowingly and intelligently waived his right to counsel." *Pedockie*, 2006 UT 28, ¶ 45. However, "reviewing courts will rarely find a valid waiver of the right to counsel absent a colloquy." *Id.*

¶33    A few cases show how this plays out. In *Frampton*, the supreme court held that "the record adequately support[ed] the conclusion that defendant knowingly and intelligently waived the right to representation by counsel." 737 P.2d at 189. This was so because the defendant "had previously been to trial twice before on the same charge" and was represented by counsel at his first trial, and because various exchanges from the record showed that the defendant "knew he faced a felony charge," was "aware of the penalty he could be subjected to if found guilty," and was aware of the technical rules of procedure. *Id.* In *Bozarth*, this court similarly held that "the record demonstrate[d]" that the defendant "understood the value of counsel and was well aware of the risks of proceeding pro se," where standby counsel had told the court that the defendant was "cognizant of what his rights" were and was "more educated in the law than other people," where the district court "confirmed" that the defendant knew that he would be required to comply with the rules of procedure, and where the defendant "clearly stated that he understood the implications of" his decision to proceed without counsel. 2021 UT App 117, ¶¶ 9, 42, 47 (quotation simplified).

¶34    Here, the record does not demonstrate that Lucke knowingly and intelligently waived his right to counsel. As noted, there was no actual finding from the district court that Lucke had knowingly and intelligently waived his right to counsel. And unlike the defendants in *Frampton* and *Bozarth*, Lucke "took no action prior to trial that demonstrate[d] an awareness of the

---

ready on the bench, for use when the occasion arises." *Patton*, 2023 UT App 33, ¶ 14 n.5.

responsibilities of pro se representation." *Patton*, 2023 UT App 33, ¶ 27. While Lucke did file pretrial subpoenas for Ex-Wife and Child, little else beyond this demonstrates that he had any understanding of the rights and responsibilities that would be his if he proceeded to trial without representation. Lucke attempted to ask irrelevant questions during voir dire, unsuccessfully tried calling a witness (Child) who had no knowledge of the events in question, and asked many irrelevant questions during cross-examination of the State's two witnesses. During his opening statement, Lucke essentially admitted to the offense when he said, "They found the one thing I couldn't not do, and they made it a felony." Throughout the trial, Lucke made no objections and never mentioned the rules of evidence or criminal procedure. And Lucke did not give a closing argument.

¶35    In short, given that there was not an adequate colloquy, we may find a valid waiver only if our review of the record shows that Lucke "understood the seriousness of the charges and knew the possible maximum penalty" and that he was also "aware of the existence of technical rules and that presenting a defense is not just a matter of telling one's story." *Lee*, 2024 UT App 2, ¶ 11 (quotation simplified). Because the record does not demonstrate this, we conclude that Lucke's waiver of the right to counsel was not knowing and intelligent.[8]

---

8. At oral argument, the State repeatedly suggested that Utah's caselaw has essentially gone off track and focused on the wrong question. In the State's view, instead of asking whether the defendant knowingly and intelligently waived the right to counsel, as *Frampton* and its progeny do, appellate courts should instead view such cases through the prism of a defendant's right to self-representation. We're not convinced that these questions are all that different. Rather, they seem to be two sides of the same constitutional coin—a defendant has the right to both self-representation and the assistance of counsel, and the exercise of one typically contemplates the waiver of the other.

(continued…)

B.      Prejudice

¶36     We next turn to the question of whether Lucke was prejudiced. As an initial matter, we note that Lucke argues that his "invalid waiver of counsel amounted to structural error for which prejudice is presumed." We agree.

¶37     A structural error is one that "affect[s] the framework within which the trial proceeds." *State v. Reece*, 2015 UT 45, ¶ 34, 349 P.3d 712 (quotation simplified). Because "the effects of [this kind of] error are simply too hard to measure or cannot be ascertained," *State v. Montes*, 2019 UT App 74, ¶ 32, 442 P.3d 1247 (quotation simplified), "we presume that a structural error affected the outcome of the case and do not require the defendant

---

In terms of the relationship between the two, the United States Supreme Court has held that because a self-representing defendant typically "relinquishes . . . many of the traditional benefits associated with the right to counsel," "in order to represent himself, the accused must knowingly and intelligently forgo those relinquished benefits." *Faretta v. California*, 422 U.S. 806, 835 (1975) (quotation simplified). In light of this, the Supreme Court then held that such a defendant "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open." *Id.* (quotation simplified).

Our supreme court echoed this perspective in *Frampton*, concluding that a district court has a "duty to determine" that a waiver of counsel was indeed "knowingly and intelligently made." 737 P.2d at 187. *Frampton* has been the law in Utah since 1987, and cases from both our supreme court and this court have repeatedly applied and enforced that requirement ever since. We are bound by our supreme court's precedents, and we are likewise bound by our own cases. *See Sterling Fiduciaries LLC v. JPMorgan Chase Bank NA*, 2017 UT App 135, ¶ 14, 402 P.3d 130; *Ortega v. Ridgewood Estates LLC*, 2016 UT App 131, ¶ 30, 379 P.3d 18. For the reasons set forth above, we conclude that the district court did not fulfill its duty in this case.

---

to show prejudice," *Reece*, 2015 UT 45, ¶ 34. "The United States Supreme Court has found structural errors only in a very limited class of cases." *State v. Bunker*, 2019 UT App 118, ¶ 10, 446 P.3d 153 (quotation simplified); *see also Washington v. Recuenco*, 548 U.S. 212, 218 (2006) ("Only in *rare* cases has this Court held that an error is structural, and thus requires automatic reversal." (emphasis added)). "Examples of such errors include mistakes in reasonable doubt instructions, the complete denial of counsel at a critical stage of a criminal proceeding, racial discrimination in jury selection, lack of an impartial trial judge, denial of the right to a public trial, and the failure to instruct the jury on the basic elements of an offense." *Reece*, 2015 UT 45, ¶ 34 (quotation simplified).

¶38　In past cases, Utah's appellate courts have not explicitly considered whether a district court's failure to ensure that a defendant's waiver of the right to counsel was knowing and intelligent constituted structural error. But the cases have acted as if it does. In a number of cases, after concluding that there was such an error, Utah's appellate courts have then reversed convictions or sentences without any discussion of prejudice at all. *See, e.g.*, *Pedockie*, 2006 UT 28, ¶ 52; *Lee*, 2024 UT App 2, ¶ 19; *West*, 2023 UT App 61, ¶ 40; *Patton*, 2023 UT App 33, ¶ 31; *Petty*, 2001 UT App 396, ¶ 12.

¶39　Having considered the matter here, we now make explicit what has been implicit before—namely, that if we see no basis for concluding that a waiver of counsel was knowing and intelligent (whether through colloquy or support from the record), the resultant error constitutes structural error. The United States Supreme Court has "identified three broad rationales for deeming an error structural": (1) "the right at issue is not designed to protect the defendant from erroneous conviction but instead protects some other interest," (2) "the effects of the error are simply too hard to measure or cannot be ascertained," and (3) "the error always results in fundamental unfairness." *Montes*, 2019 UT App 74, ¶¶ 30–33 (quotation simplified). The right to knowingly

and intelligently waive counsel implicates both the second and third rationales.

¶40    It would be exceedingly difficult for an appellate court to retroactively measure the effects of a defendant not having had the benefit of counsel before or during the trial. This is so because of the wide range of decisions that counsel makes during the investigation, planning, and presentation phases of the case. Perhaps counsel could have made better investigation decisions, or negotiated a favorable plea deal with the prosecutor, or made better decisions about what defenses to run or not run at trial, or recognized and raised valid competency concerns, or presented the case and the defendant in a better light to the jury, or presented the case and the defendant in a more favorable light to the court at sentencing. Each of these decisions (or any number of others) could set the case off on an entirely different path, so it becomes simply too difficult to figure out how to measure the impact that counsel may have had if counsel had been involved in the case.

¶41    For similar reasons, it would be fundamentally unfair to allow a defendant to go to trial without counsel without first ensuring (whether it be by colloquy or the broader record itself) that the defendant was knowingly and intelligently making that choice. As the United States Supreme Court has observed in an analogous context—namely, in the context of a defendant's right to counsel of his choice—"[t]he right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial." *Glasser v. United States*, 315 U.S. 60, 76 (1942), *superseded on other grounds by rule as stated in Bourjaily v. United States*, 483 U.S. 171 (1987). As the Supreme Court explained in a different case,

> The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel. Even the intelligent and educated layman has small and sometimes no skill in the

science of law. If charged with crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one. He requires the guiding hand of counsel at every step in the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence.

*Powell v. Alabama*, 287 U.S. 45, 68–69 (1932).

¶42 We accordingly conclude that the kind of error at issue in this case constitutes structural error. And because we held above that the district court failed to ensure that Lucke knowingly and intelligently waived his right to counsel, we reverse his conviction.[9]

---

9. Through appellate counsel, Lucke also argues that the district court plainly erred by not ordering a competency hearing before trial or sentencing. This was so, according to appellate counsel, because "there was a substantial question of possible doubt" about Lucke's "competency to proceed," and more specifically about whether Lucke "possessed a 'rational and factual understanding of the criminal proceedings against [him] and of the punishment specified for the offense.'" (Quoting Utah Code § 77-15-2(2).)

When "determining whether the lower court should have ordered a competency hearing, we consider only those facts that were before the trial court" at the relevant time. *State v. Arguelles*,

(continued…)

CONCLUSION

¶43    The district court did not conduct an adequate *Frampton* colloquy, nor does the record establish that Lucke knowingly and intelligently waived his right to counsel. We therefore vacate his conviction and remand for further proceedings consistent with this opinion.

———————

2003 UT 1, ¶ 50, 63 P.3d 731 (quotation simplified). But the facts that arguably demonstrate that Lucke was incompetent are now several years old. And as appellate counsel acknowledged at oral argument, competency is fluid.

   We have no need to determine whether Lucke should have been evaluated for competency before a trial whose results we've now vacated. But we note that under Utah law, a court should order a competency evaluation if "there is a substantial question of possible doubt as to a defendant's competency" at the relevant time. *Id.* ¶ 49 (quotation simplified); *see also State v. Anderson*, 2024 UT App 65, ¶ 19, 549 P.3d 101, *cert. denied*, 554 P.3d 1098 (Utah 2024). On remand, the district court will of course be free to consider whether a competency evaluation should now be ordered. And in making such a determination, the court may consider both its prior interactions with Lucke and those that occur in any future proceedings as well.