**2025 UT App 157**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
RYAN L. HORROCKS,
Appellant.

Opinion
No. 20230322-CA
Filed October 30, 2025

Eighth District Court, Vernal Department
The Honorable Clark A. McClellan
No. 191800621

Ramon Ortiz, Debra M. Nelson, Benjamin Miller, and
Wendy M. Brown, Attorneys for Appellant

Derek E. Brown and Connor Nelson,
Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and AMY J. OLIVER
concurred.

HARRIS, Judge:

¶1 Ryan L. Horrocks was caught on camera taking stripped copper wire from a business, and he was later charged with third-degree-felony theft. Horrocks represented himself at trial, after he fired his appointed counsel and was unable to hire a private attorney. At the end of the trial, the jury convicted him as charged. Horrocks now appeals that conviction, asserting that he did not ever actually waive his right to counsel and that, even if he did, any such waiver was not knowing and voluntary. We find merit in Horrocks's arguments, and we therefore vacate his conviction and remand this case to the trial court for further proceedings.

BACKGROUND[1]

¶2 In the early morning hours, while it was still dark outside, a person entered the outdoor premises of a business (the Business), took buckets containing stripped copper wire, and loaded those buckets into his truck. The Business had previously installed a motion sensor camera, and that camera captured images of the person taking the buckets of wire. In those images, the person had a tattoo on his back and shoulders that said "Horrocks"; the tattoo could be seen through the person's tank top. Horrocks eventually stipulated that he was the person who could be seen in the images.

¶3 The State later charged Horrocks with one count of theft; the State charged it as a third-degree felony, rather than as a misdemeanor, because Horrocks had "prior convictions for theft." At his initial appearance in the case, the court determined that Horrocks was indigent and appointed counsel (Counsel) to represent him. The case was eventually scheduled for trial, but

---

1. "In an appeal from a jury trial, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly, and we present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Kufrin*, 2024 UT App 86, n.1, 551 P.3d 416 (cleaned up). Recognizing, however, that our reversal of Horrocks's conviction causes the presumption of innocence to reattach, *see Betterman v. Montana*, 578 U.S. 437, 441 n.2 (2016) (observing that "upon renewed prosecution following a defendant's successful appeal," the defendant "again enjoys the presumption of innocence"), we apply this standard somewhat guardedly here. Specifically, concerning the facts surrounding the charged crime, we identify the evidence that supports the verdict, while refraining from characterizing the alleged criminal conduct as established fact.

Horrocks—who had been out of custody—failed to appear for the trial, and the court issued a warrant for his arrest.

¶4     Horrocks did appear at a hearing a few weeks later. At that hearing, the court told Horrocks that he would be taken into custody for his failure to appear at the scheduled trial. For his part, Horrocks told the court he wanted to "fire" Counsel and hire his own attorney, apparently because his relationship with Counsel had deteriorated. The court explained to Horrocks that the decision to fire an appointed attorney was not entirely up to him, but told Horrocks that, while in custody, he could make arrangements to hire his own attorney.

¶5     At Horrocks's next appearance some two weeks later, Counsel was present, and Horrocks had not yet hired a different attorney. Horrocks explained to the court that he had been unable to "do anything from the jailhouse" to hire an attorney. The court offered to "appoint an attorney to represent" Horrocks, an offer Horrocks apparently interpreted as having Counsel represent him, and Horrocks responded that he'd rather "represent [him]self." The court then engaged in the following colloquy (the Partial Colloquy) with Horrocks:

> Q: You can represent yourself if you want—
>
> A: I do.
>
> Q: —but I've got to ask you a bunch of questions about that.
>
> A: Okay.
>
> Q: Have you, Mr. Horrocks, ever represented yourself before in a criminal case?
>
> A: Yes.

Q: In a felony case?

A: No.

Q: Okay. You understand a felony case, this case has a possible . . . prison sentence [of zero] to five years?

A: Yes, sir.

Q: And you're going to be treated the same as anybody else, meaning not—let me rephrase that. There are rules of procedure and evidence that apply in court cases that go to jury, okay?

A: Copy.

Q: And if the State objects that some of your evidence is not admissible because it's hearsay or whatever the basis may be, then I will evaluate that on the same basis as if the objection were made with an attorney or not and whether you're—and I don't represent you, I sit here to call balls and strikes. Okay? Do you understand that?

A: I do, yeah.

Q: What's the highest level of school you completed?

A: Twelfth grade.

Q: Twelfth grade?

A: Yes, Your Honor.

Q: What kind of work do you do? What's your
occupation? The reason I ask is I'm just trying to
figure out what familiarity you have with
procedures and written procedures and
following—

A: I'm pretty—I've read a lot of law books.

Q: So you have—

A: —concerning me, you know.

Q: —some experience reading cases and—

A: Oh, yeah.

Q: —understanding cases? You understand that if
there are motions in limine, anything to exclude
evidence, you would have to raise those issues
with me?

A: Sure.

Q: Okay.

¶6    Horrocks then mentioned that he had still not "read a
discovery yet," and he explained that he had decided not to show
up for his first trial date because he felt unprepared. The court
stated that if Horrocks was "not going to be represented by
counsel," then the court would make sure that Horrocks was
provided with discovery. But Horrocks told the court that he
wanted "to hire an attorney," and that he had "two pickup trucks"
he was willing to sell to pay legal fees but that he couldn't "do
anything from a jail cell." The court asked Horrocks how long he
thought it would take for him to hire an attorney, and Horrocks
said he didn't know but that he'd "get right on it" if he were
released. The court then agreed to release Horrocks so that he

could hire an attorney, and it scheduled a review hearing to take place in four weeks.

¶7     At the review hearing, Horrocks explained that he had not yet been able to hire an attorney. He told the court, "It's looking like I'll represent myself." Again, the court explained that he could proceed with an appointed attorney, but Horrocks stated that he had "money in the markets," apparently implying that he might no longer qualify for an appointed attorney. The court asked Horrocks how long it would take for him to hire an attorney, and Horrocks said he thought he could make the hire by July 18. The court then said, "I'll give you until July 18th," and it scheduled another review hearing for that date.

¶8     At the July 18 hearing, the court asked Horrocks about his efforts to retain counsel, and Horrocks replied, "It's looking like I'm riding solo." The court again inquired about Horrocks's financial status, but after Horrocks told the court what his monthly income was, the court offered its view that Horrocks didn't "qualify for court-appointed counsel." In response, Horrocks stated, "No, I got to represent myself. I don't think I can pay a lawyer enough to help me." The court then said, "All right," and it proceeded to set a scheduling conference at which a trial date would be set. Horrocks then told the court that he still had not reviewed the discovery in the case, and he complained that Counsel had not sent it to him even after a request. The court told Horrocks to "[j]ust make a request to the State," and Horrocks responded by asking, "Who's the State?" The court explained that "the State" is "the prosecutor."

¶9     A jury trial took place a few months later. For the most part, Horrocks represented himself throughout the trial, although he "was assisted in chambers" during the jury selection process by a volunteer attorney. Before trial began, the court discussed the case with Horrocks and the prosecutor, and Horrocks indicated that he would be calling his brother-in-law (Witness), who Horrocks

represented was "an electrical wire expert." Horrocks explained that Witness would testify, among other things, about the "value of wire." The State and the court explained to Horrocks that the theft count had been charged as a felony because Horrocks had prior theft convictions and not because the wire had a certain value, and that therefore "the value of the property doesn't matter." Horrocks appeared surprised by this explanation, and he responded by stating, "Wow." But the court did not prevent Horrocks from calling Witness, stating, "I don't know that it's going to be relevant, but if you want to call [Witness] and [the State] has no objection, I'll let you ask him."

¶10 A few minutes later, the court discussed jury instructions with the parties. Horrocks again indicated that he wanted to present evidence regarding the value of the stolen wire, and the court again responded that the value of the wire was irrelevant to whether Horrocks was guilty of the charged crime and that the value of the wire would become relevant only if Horrocks were convicted and the court were setting a restitution amount.

¶11 After jury selection was completed, the court gave preliminary instructions to the jury, and both parties gave an opening statement. Horrocks's opening statement was limited to the following:

> This case is from [three years ago]. I'm not going to get into why it's taken so long. But [the State] is going to show you some pictures of me with clear evidence of me trespassing and dumpster diving, but no clear evidence of me stealing anything from [the Business].
>
> And I just want to convey to you all that I've always been accountable and I've had my troubles and if this was a trespassing case, I'd stand here and I'd say guilty and I'd go to jail or whatever. I just— but I don't know. I just follow the evidence because

this is a third-degree—it started out a burglary—
. . . . But I [don't] think the [State] can prove that
there's evidence of me stealing from [the Business].
Thank you.

¶12   After opening statements, the State called two witnesses in support of its case. The first witness, an employee of the Business, explained that he had set up the camera, and he identified what was shown in the images it captured. The second witness was a police officer, and he testified about his involvement in the investigation. Horrocks briefly cross-examined both witnesses, but he lodged no objections and did not ever mention the rules of evidence or criminal procedure. The court also admitted seventeen photographs that contained images captured by the camera, and Horrocks agreed that he was the person who could be seen in those photographs.

¶13   Horrocks did not present any evidence on his behalf, either from himself or from Witness.

¶14   After the evidence was presented, the court gave additional instructions to the jury, and both the State and Horrocks made closing arguments. After deliberation, the jury convicted Horrocks as charged. The court later sentenced Horrocks to prison for up to five years but suspended that sentence and placed Horrocks on probation, with conditions.

ISSUE AND STANDARD OF REVIEW

¶15   Horrocks now appeals his conviction, asserting that he never waived his right to counsel and that, even if he did, any such waiver was not knowing and voluntary.[2] Whether a

---

2. In his brief, Horrocks also asserts that the trial court committed plain error by sending an improper verdict form to the jury. But

(continued…)

defendant "voluntarily, knowingly, and intelligently waived [the] right to counsel is a mixed question of law and fact. While we review questions of law for correctness, a trial court's factual findings may be reversed on appeal only if they are clearly erroneous." *State v. Pedockie*, 2006 UT 28, ¶ 23, 137 P.3d 716 (cleaned up). "In the absence of a colloquy, we review the record de novo to determine whether the defendant knowingly and intelligently waived [the] right to counsel." *State v. West*, 2023 UT App 61, ¶ 17, 532 P.3d 114.

## ANALYSIS

¶16    The issue Horrocks raises presents three sub-issues, which we discuss in turn. First, we assess whether Horrocks ever voluntarily waived his right to counsel. Second, we examine whether, on this record, any waiver Horrocks might have made can be considered knowing and voluntary. And finally, we consider the State's argument that, even if Horrocks did not make a voluntary, knowing, and intelligent waiver of his right to counsel, any error should be considered harmless.

### A.    Voluntary Waiver

¶17    "Courts have recognized three methods pursuant to which a defendant may give up [the] constitutional right to the assistance of counsel: [true] waiver, forfeiture, and waiver by conduct." *State v. Pedockie*, 2006 UT 28, ¶ 27, 137 P.3d 716. "True waiver is the most common method," and it requires defendants to "clearly and unequivocally request self-representation in order to waive their right to counsel." *Id.* ¶ 28 (cleaned up). On "the opposite end of the spectrum," "a defendant may be deemed to have forfeited [the] right to counsel when [the defendant] engages in extremely dilatory conduct or abusive behavior, such as

---

given our resolution of the other issue Horrocks raises, we need not address this one.

physically assaulting counsel." *Id.* ¶¶ 31–32 (cleaned up). Lastly, waiver by conduct—"often referred to as implied waiver"—occurs "once a defendant has been warned that [the defendant] will lose [the defendant's] attorney if [the defendant] engages in dilatory tactics." *Id.* ¶ 33 (cleaned up). In such situations, "any misconduct thereafter may be treated as an implied request to proceed pro se and thus, as a waiver of the right to counsel." *Id.* (cleaned up). "Unlike forfeiture, waiver by conduct must be knowing and intelligent in that a defendant must have been aware of the dangers and disadvantages of self-representation at the time of the waiver." *State v. Montes*, 2019 UT App 74, ¶ 22, 442 P.3d 1247 (cleaned up). Horrocks and the State agree that neither true waiver nor forfeiture is at issue here, but the State asserts that Horrocks, through his actions, impliedly waived his right to counsel. The record, however, does not support this contention.

¶18 Before a defendant will be deemed to have voluntarily waived the right to counsel through conduct, "the trial court must warn the defendant of the specific conduct that will give rise to the waiver of [the] right to counsel." *Pedockie*, 2006 UT 28, ¶ 37. "In other words, when a trial court believes that a defendant's conduct is unacceptable and will result in a waiver of [the] right to counsel, the court must warn the defendant that continuation of the unacceptable conduct will be treated as an implied request to proceed pro se and, thus, as a waiver of the right to counsel." *Id.* And any such warning "must be explicit so that a defendant clearly understands both the nature of the unacceptable conduct and the implications of any such future conduct." *Id.*

¶19 In *Pedockie*, for instance, our supreme court found that the defendant "did not voluntarily waive his right to counsel through his conduct" because the warnings he received were not explicit enough. *Id.* ¶ 47. In that case, "the trial judge warned [the defendant] that he would need to either accept [counsel's] advice, represent himself, or get his own attorney," but stated that the defendant had a right to appointed counsel even after he fired his

attorney. *Id.* ¶ 48. Once the defendant fired another appointed attorney, the court scolded the defendant and told him that he "would need to hire a private attorney or proceed pro se." *Id.* ¶ 49. Even after these warnings, "the trial judge agreed to appoint the public defender's office for the third time." *Id.* Importantly, "the trial judge never warned [the defendant] of the conduct that would give rise to an implied waiver of his right to appointed counsel." *Id.* Under the circumstances, our supreme court concluded that the warnings given were "inconsistent and confusing" and were therefore not enough to render the defendant's actions equivalent to an implied waiver. *Id.* ¶ 47.

¶20 In similar cases, we have followed suit and held that when a defendant is not given a sufficiently explicit warning, that defendant cannot have been deemed to have impliedly waived the right to counsel through conduct. *See, e.g., Montes*, 2019 UT App 74, ¶ 26 (holding that a defendant did not impliedly waive the right to counsel where the court told him "to choose whether to represent himself or accept [the appointed counsel's] representation" but did not tell him that he would lose his right to counsel if he did not choose); *State v. Houston*, 2006 UT App 437, ¶ 10, 147 P.3d 543 (holding that a defendant did not impliedly waive his right to counsel where the trial court "did not explicitly advise [the defendant] that his failure to [obtain counsel or submit an affidavit of indigency] would result in pro se representation").

¶21 By contrast, we have upheld a trial court's determination of implied waiver when the court's warning was sufficiently explicit. For instance, in *State v. Santonio*, "the trial court repeatedly expressed its frustration with [the defendant's] dilatory behavior in obtaining counsel, urged him to obtain counsel, and warned him that he might have to proceed pro se if he did not obtain counsel." 2011 UT App 385, ¶ 16, 265 P.3d 822 (cleaned up). Later, the court told the defendant that, "by [his] actions, [he] may deprive [him]self of" the right to counsel. *Id.* And after a continuance, the court gave an additional warning

"that, in light of [the previous] warning, the court intended to go forward" with the hearing on the scheduled date "regardless of whether [the defendant] had obtained an attorney by that time." *Id.* Under those circumstances, we affirmed the trial court's determination that the defendant had waived his right to counsel through conduct, holding that the court's "meticulous warnings, coupled with [the defendant's] continued failure to obtain counsel," established an implied waiver. *Id.*

¶22 Here, though, the facts are much more analogous to *Pedockie*, *Montes*, and *Houston* than they are to *Santonio*. The key fact in the caselaw appears to be whether the trial court expressly warned the defendant that if the defendant took (or did not take) a certain action by a certain date, the defendant would be deemed to have waived the right to counsel. In this case, no such express warning was ever given: the trial court never told Horrocks that, if he failed to obtain private counsel by a certain date, he would be deemed to have waived his right to counsel. The closest the court came was when it told Horrocks that it would "give [him] until July 18th." But in context, this statement was merely meant to convey that Horrocks would have at least until the date of the next hearing—which the court simultaneously scheduled for July 18—to find an attorney. Significantly, the court never told Horrocks that there would be meaningful consequences if he failed to obtain a lawyer by that date. In short, the record simply does not contain the sort of express warning upon which a determination of implied waiver can be based.

¶23 For these reasons, we reject the State's assertion that Horrocks made an implied waiver, through conduct, of his right to counsel. And because the parties agree that there was no true waiver or forfeiture, we conclude that Horrocks did not ever voluntarily waive his right to counsel.

B.     Knowing and Intelligent Waiver

¶24     Moreover, even if we could somehow construe Horrocks's behavior or statements as indicating a voluntary desire to represent himself, the record does not support the conclusion that any such waiver of his right to counsel was knowingly and intelligently made. For a waiver to be valid, it must be knowing and intelligent, and this is true regardless of whether the waiver is express or implied. *See State v. Frampton*, 737 P.2d 183, 187 (Utah 1987) (true waiver); *Pedockie*, 2006 UT 28, ¶ 36 (implied waiver).

¶25     "Our cases set out two paths under which a court can find that a defendant's waiver was knowing and intelligent." *State v. Lucke*, 2025 UT App 49, ¶ 22, 569 P.3d 238, *cert. granted*, Sept. 19, 2025 (No. 20250519). "First, a colloquy on the record is the preferred method of determining whether a defendant is aware of the risks of proceeding pro se." *Id.* (cleaned up); *see also State v. West*, 2023 UT App 61, ¶ 31, 532 P.3d 114 ("The best way to ascertain if a defendant has the requisite knowledge of the legal mire [the defendant] wishes to wade into is for a court to engage in penetrating questioning on the record." (cleaned up)). And our supreme court has noted that "the sixteen-point colloquy found in *State v. Frampton* establishes a sound framework for efficient and complete questioning" while also providing "the reviewing court with an objective basis for review upon the almost inevitable challenge to the waiver by the defendant who proceeds pro se and is subsequently convicted." *Pedockie*, 2006 UT 28, ¶ 42 (cleaned up). If a complete *Frampton* colloquy is given, then a defendant is usually deemed to have made a knowing and intelligent waiver. *See Lucke*, 2025 UT App 49, ¶ 25 (stating that the *Frampton* colloquy "provides both the defendant and the court with the necessary information to determine that the defendant's waiver of counsel was indeed knowing and intelligent").

¶26     It is undisputed that the trial court in this case did not provide Horrocks with a complete *Frampton* colloquy. As in *Lucke*,

the trial court here asked "some, but not all, of the questions." *Id.* ¶ 26. For instance, in the Partial Colloquy, the court asked Horrocks whether he had represented himself in a criminal case before; whether he understood that the maximum sentence for the charged third-degree felony was a prison term of up to five years; and whether he understood that he would be expected to know the rules of evidence and procedure. But the court did not ask Horrocks other important questions contained in the *Frampton* colloquy, such as whether he understood how to present his own testimony. *See Frampton*, 737 P.2d at 187 n.12. And perhaps most significantly, the court made no attempt to advise Horrocks that he would be better off with an attorney and that it would be unwise for him to proceed pro se. *See id.* (noting that an important part of the colloquy is for the court to "advise" the defendant that the defendant "would be far better defended by a trained lawyer" than by proceeding pro se, and that it would be "unwise" for the defendant to proceed pro se (cleaned up)).

¶27 We agree with Horrocks that the Partial Colloquy was not the sort of "penetrating questioning" envisioned by *Frampton*, *see id.* at 187, and that it did not shed sufficient light on Horrocks's "level of understanding about the risks he was accepting and the benefits he was forfeiting," *see State v. Patton*, 2023 UT App 33, ¶ 16, 528 P.3d 1249. As we did in *Lucke*, we here conclude that, based solely on the Partial Colloquy, "the court had no meaningful basis for ascertaining whether [Horrocks] actually understood both the right he was waiving and the risks of proceeding along" the path of self-representation. *See* 2025 UT App 49, ¶ 30.

¶28 The second possible path under which a court might find a knowing and intelligent waiver, even where no complete colloquy is present, involves an examination of the entire record. *See Pedockie*, 2006 UT 28, ¶ 45 (stating that, even when the trial court does not conduct a sufficient colloquy, "a reviewing court should review the record de novo to determine whether the

defendant knowingly and intelligently waived [the] right to counsel"); *Lucke*, 2025 UT App 49, ¶ 32 ("Even without an adequate colloquy, we may still review the record de novo to determine whether the defendant knowingly and intelligently waived [the] right to counsel." (cleaned up)). But our supreme court has noted that, "considering the strong presumption against waiver and the fundamental nature of the right to counsel, any doubts" that arise during the examination of the entire record "must be resolved in favor of the defendant."[3] *Pedockie*, 2006 UT 28, ¶ 45. And in this same vein, the supreme court has stated that it "anticipate[s] that reviewing courts will rarely find a valid waiver of the right to counsel absent a colloquy." *Id.* After reviewing the record as a whole,[4] we conclude that this case is not

---

3. As we have noted previously, "there's something of a conflict in our supreme court's cases" on this point. *See State v. Lucke*, 2025 UT App 49, ¶ 23 n.4, 569 P.3d 238, *cert. granted*, Sept. 19, 2025 (No. 20250519). In *State v. Frampton*, the court said that where a "defendant expressly decline[s] an offer of counsel by the trial judge, [the defendant] has the burden of showing by a preponderance of the evidence that [the defendant] did not [knowingly and intelligently] waive this right." 737 P.2d 183, 187 (Utah 1987). But in *State v. Pedockie*, the court included the "resolved in favor of the defendant" language. 2006 UT 28, ¶ 45, 137 P.3d 716. In this appeal, we believe that the outcome would be the same under either rubric. But we cite the *Pedockie* language here, in text, because it is the most recent pronouncement on this point from our supreme court.

4. There is an inconsistency in our caselaw regarding whether the record to be examined here consists only of the record up to the point of the purported waiver, or whether it consists of the entire record (including actions that occurred after the purported waiver). *Compare Frampton*, 737 P.2d at 188 ("Even absent such a colloquy, however, this [c]ourt will look at any evidence in the

(continued…)

one of those presumably rare cases in which the record indicates that a defendant who was not provided a proper colloquy nevertheless made a knowing and intelligent waiver.

¶29 On a few occasions, Utah's appellate courts have concluded that, despite the lack of a proper colloquy, the record contained enough evidence to show that the defendant nevertheless made a knowing and intelligent waiver of the right to counsel. One such case was *Frampton* itself, a case in which the defendant had already been to trial twice before on the same charge. *See* 737 P.2d at 189. The first time, he had been represented by counsel, and the case "resulted in a hung jury." *Id.* The second time, he had represented himself, and the case ended in a mistrial. *Id.* During that second trial, the court had carefully explained the charges and possible penalties to the defendant, and "the judge truly accorded [the] defendant every courtesy by explaining applicable procedure and giving [him] extremely wide latitude in conducting his defense." *Id.* Under those unique circumstances, our supreme court held that "the record adequately support[ed] the conclusion that [the] defendant knowingly and intelligently waived the right to representation by counsel." *Id.*

¶30 Similarly, in *State v. Bozarth*, this court concluded that, despite the lack of a proper colloquy, the record indicated that the defendant made a knowing and intelligent waiver of his right to counsel. 2021 UT App 117, ¶¶ 40–50, 501 P.3d 116. In that case, the court appointed standby counsel to assist the defendant "on a limited basis," *id.* ¶ 10, and we noted that the "record [was] replete

_____

record which shows a defendant's actual awareness of the risks of proceeding pro se."), *with Pedockie*, 2006 UT 28, ¶ 50 (considering the record "at the time of the alleged waiver"). But we need not resolve that inconsistency here, because even examining the entire record, including conduct that occurred after the purported waiver, there is insufficient indication that Horrocks made a waiver that was knowing and intelligent.

with evidence indicating that [the defendant] understood his role along with the limited role of standby counsel," *id.* ¶ 46. Indeed, during the hearing on counsel's withdrawal, counsel observed that the defendant was "more educated in the law than other people," that he was "cognizant of what his rights are," and that he knew "the law to some degree." *Id.* ¶ 9. Later, while representing himself, the defendant negotiated a plea agreement with the State, and he agreed to plead guilty to a reduced misdemeanor charge. *Id.* ¶ 18. Based on these facts, we observed that "the record demonstrate[d] that [the defendant] understood the value of counsel and was well aware of the risks of proceeding pro se." *Id.* ¶¶ 42, 44. And we noted that the defendant successfully "filed numerous court documents," "unambiguously indicated that he understood" his responsibilities and standby counsel's role, "lodg[ed] objections," and "compl[ied] with the rules of evidence" during a hearing. *Id.* ¶¶ 46–48.

¶31    And more recently, in *State v. Levering*, we reached a similar conclusion. 2025 UT App 111, ¶¶ 22–32, 575 P.3d 309, *petition for cert. filed*, Sept. 17, 2025 (No. 20251100). In that case, the trial court "conducted most of the *Frampton* colloquy," leaving out only "the last three questions." *Id.* ¶ 24. Importantly, the court warned the defendant that he would be "far better served if [he] were defended by a trained lawyer rather than [him]self" and that it would be "unwise to try and represent [him]self," and the court "strongly urge[d] [the defendant] not to try to represent [him]self." *Id.* ¶ 12. And we concluded that the defendant's awareness of the issues that would have been covered in the three missing colloquy questions could be readily inferred from the record as a whole. *Id.* ¶¶ 24–31. On that record, we concluded that the defendant's "waiver of his right to counsel was made voluntarily, knowingly, and intelligently." *Id.* ¶ 32.

¶32    But these cases are rare. More often, when the absence of a full colloquy compels an examination of the complete record, courts conclude that the record does not support the conclusion

that the defendant made a knowing and intelligent waiver of the right to counsel. *See, e.g.*, *Pedockie*, 2006 UT 28, ¶¶ 50–52; *State v. Lee*, 2024 UT App 2, ¶¶ 11–18, 542 P.3d 974; *West*, 2023 UT App 61, ¶¶ 32–39; *Patton*, 2023 UT App 33, ¶ 31; *State v. Houston*, 2006 UT App 437, ¶ 11, 147 P.3d 543. Indeed, our recent *Lucke* case is a good example of this. In the absence of a proper colloquy, we examined the entire record in the case, and we concluded that the defendant did not knowingly and intelligently waive his right to counsel. *Lucke*, 2025 UT App 49, ¶¶ 32–35. Unlike the defendants in *Frampton* and *Bozarth*, the defendant in *Lucke* "took no action prior to trial that demonstrated an awareness of the responsibilities of pro se representation." *Id.* ¶ 34 (cleaned up). Although the defendant did manage to "file pretrial subpoenas" for two witnesses, "little else beyond this demonstrate[d] that he had any understanding of the rights and responsibilities that would be his if he proceeded to trial without representation." *Id.* And during trial, the defendant "attempted to ask irrelevant questions during voir dire, unsuccessfully tried calling a witness . . . who had no knowledge of the events in question, and asked many irrelevant questions during cross-examination of the State's two witnesses." *Id.* We also noted that the defendant made an ineffectual opening statement and that, during the trial, he "made no objections and never mentioned the rules of evidence or criminal procedure." *Id.*

¶33　Similarly here, the record when viewed as a whole does not support the conclusion that Horrocks made a knowing and intelligent waiver of his right to counsel. Horrocks took no actions prior to trial that "demonstrated an awareness of the responsibilities of pro se representation." *Id.* (cleaned up). Indeed, Horrocks appeared not to understand the basis of the charge pending against him, and the trial court had to explain to him—twice—that the theft count had been charged as a felony not because of the value of the allegedly stolen property but because he had prior theft convictions. The court also had to explain to him who "the State" was and how to make a request of the State.

The only witness that Horrocks said he wanted to call was apparently going to testify about the value of copper wire; Horrocks ended up not calling Witness—or anyone else— apparently because he eventually realized, as late as the day trial was to begin, that value didn't matter. Horrocks's opening statement was ineffectual, and his cross-examination of the State's two witnesses was cursory. And like the defendant in *Lucke*, during trial Horrocks "made no objections and never mentioned the rules of evidence or criminal procedure." *See id.* This record, even when viewed as a whole, simply cannot support a determination that, in the absence of a proper colloquy, Horrocks knowingly and intelligently waived his right to counsel.

¶34 The State resists this conclusion, pointing to several things in the record, including the following: that Horrocks was represented by Counsel during the early stages of the case and by a different volunteer attorney during jury selection; that Horrocks managed to make an opening statement and cross-examine witnesses; and that Horrocks at times told the court that he "got it" and that he "kn[e]w what [he was] doing." But it strikes us that these (or similar) facts will be present in nearly all cases in which a defendant proceeds to trial pro se, and that these facts, even taken together, are simply not enough to overcome the "strong presumption against waiver" and the notion that "any doubts must be resolved in favor of the defendant." *See Pedockie*, 2006 UT 28, ¶ 45.

¶35 Accordingly, for all of these reasons, we agree with Horrocks that the record, when viewed as a whole, does not support the conclusion that he made a knowing and voluntary waiver of his right to counsel.

C. Prejudice

¶36 Finally, and despite the lack of any voluntary, knowing, or intelligent waiver, the State asserts that Horrocks's conviction can be affirmed because any error here was harmless. As the State sees

it, the evidence against Horrocks was so overwhelming that not even the most competent attorney could have persuaded the jury to acquit Horrocks and that the presence or absence of counsel therefore did not matter here. We acknowledge the State's point—after all, Horrocks was caught on video taking buckets from Business's premises.

¶37    But as Horrocks points out, harmless-error analysis is inappropriate here, because any error in the process regarding the waiver of a defendant's right to counsel constitutes structural error that triggers automatic reversal. Indeed, we reached this very conclusion in *Lucke*. *See* 2025 UT App 49, ¶ 39 ("[I]f we see no basis for concluding that a waiver of counsel was knowing and intelligent . . ., the resultant error constitutes structural error."). We recognize that our supreme court has granted a petition for certiorari in *Lucke*, but for now, that case represents the governing law of the state, and no party asks us to reconsider it here.[5]

¶38    Accordingly, we decline the State's invitation to apply harmless-error analysis in this case. The fact that Horrocks made no voluntary, knowing, and intelligent waiver of his right to counsel before representing himself at trial is a structural error that requires reversal.

---

5. While no party asks us to reconsider *Lucke*, the State did file a motion asking us to stay resolution of this appeal due to the scope of the Utah Supreme Court's grant of certiorari in *Lucke*. As explained in its motion, the State would prefer that we hold the issuance of this opinion until after our supreme court issues an opinion in *Lucke*. But given the stage this case was in at the time the motion was filed, a majority of this panel (Judge Oliver, dissenting) votes to deny the State's motion and to issue this opinion in due course. The State's motion is therefore denied.

CONCLUSION

¶39    For the reasons discussed, we conclude that Horrocks did not voluntarily waive his right to counsel, and that any such waiver—even if made—cannot on this record be considered knowing and intelligent. Because of this, the trial contained a structural error that warrants reversal, and on that basis we vacate Horrocks's conviction and remand this case for further proceedings, including potentially a new trial.